DAVID C. ALLEN (SBN 190479)
dallen@akingump.com
DAVID W. NELSON (SBN 240040)
dnelson@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone:   310-229-1000
Facsimile:   310-229-1001

Attorneys for Plaintiffs
BURTON WAY HOTELS, LTD.;
BURTON WAY HOTELS, LLC; and
ACC COMPANY.

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 1 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

#### WESTERN DIVISION

| | |
|---|---|
| BURTON WAY HOTELS, LTD., a California limited partnership; BURTON WAY HOTELS, LLC, a Delaware limited liability company; and ACC COMPANY, a California general partnership.<br><br>Plaintiffs,<br><br>v.<br><br>FOUR SEASONS HOTELS LIMITED, a Ontario (Canada) corporation.<br><br>Defendant. | Case No. **CV11 0303** PSG PLAx<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT;**<br><br>**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**(3) BREACH OF CONTRACT;**<br><br>**(4) BREACH OF FIDUCIARY DUTY;**<br><br>**(5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE; AND**<br><br>**(6) UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.**<br><br>**[Demand For Jury Trial]** |

COMPLAINT
[Demand For Jury Trial]

200152234 v3

1    Plaintiffs Burton Way Hotels, Ltd., Burton Way Hotels, LLC and ACC Company

2  bring this action against Defendant Four Seasons Hotels Limited ("Defendant") for (i)

3  breach of contract, (ii) breach of implied covenant of good faith and fair dealing, (iii)

4  breach of fiduciary duty, (iv) intentional interference with prospective business

5  advantage, and (v) unfair business practices in violation of California Business and

6  Professions Code § 17200, *et seq.*

7    Plaintiffs, the owners of a luxury hotel, have a current and on-going relationship

8  with Defendant, Plaintiffs' hotel manager.  In that role, Defendant controls all aspects of

9  the day-to-day operations of Plaintiffs' hotel.  Plaintiffs seek judicial relief, including a

10  permanent injunction, to vindicate a contractual right to the exclusive use of the "Four

11  Seasons" luxury hotel brand within a specified geographical area of Beverly Hills and

12  West Los Angeles.  Plaintiffs also seek damages arising from the Defendant's breach of

13  fiduciary duties and improper use of the Four Seasons brand and operating systems at a

14  nearby competing hotel in violation of Defendant's legal and contractual duties to

15  Plaintiffs.  Plaintiffs allege as follows:

16

17                    **JURISDICTION AND VENUE**

18    1.    This Court has subject matter jurisdiction over this action pursuant to 28

19  U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and

20  the amount in controversy exceeds $75,000.

21    2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2)

22  and § 1391(d).

23

24                        **THE PARTIES**

25    3.    Burton Way Hotels, Ltd. ("BWH LTD") is a California limited partnership,

26  with its principal place of business in the County of Los Angeles, California.  Each of

27  the individuals with a partnership interest in BWH LTD is a citizen of the State of

28

1

COMPLAINT
[Demand For Jury Trial]

200152234 v3

California.  From 1985 to September 27, 1999, BWH LTD was the lessee of real property located at 300 South Doheny Drive, Los Angeles (hereinafter, "the PROPERTY").   The PROPERTY is bounded by West Third Street, Burton Way, South Doheny Drive and South Wetherly Drive.  Also, from 1985 to September 27, 1999, BWH LTD was the owner the Four Seasons Hotel in Los Angeles (hereinafter, "the HOTEL"), which was constructed on the PROPERTY.

4.      Burton Way Hotels, LLC ("BWH LLC") is a Delaware limited liability company, with its principal place of business in the County of Los Angeles, California. BWH LTD is the only member and 100% owner of BWH LLC.  On September 27, 1999, BWH LTD assigned to BWH LLC, among other things:  (a) all of the former's leasehold interest in and to the PROPERTY; (b) all of its right, title and interest in and to the HOTEL; and (c) all of its rights under its hotel management agreement with Defendant.  From September 27, 1999 to the present, BWH LLC has been the lessee of the PROPERTY and the owner of the HOTEL.  At times in this complaint, BWH LTD and BWH LLC are collectively referred to as BWH.

5.      ACC Company ("ACC") is a California general partnership, with its principal place of business in the County of Los Angeles, California.  Each of the individuals with a partnership interest in ACC is a citizen of the State of California. ACC is the owner and lessor of the PROPERTY.  Although separate entities, ACC, BWH LTD and BWH LLC have overlapping ownership.

6.      Four Seasons Hotels Limited (hereinafter "Defendant") is a corporation incorporated under the laws of the Province of Ontario, Canada, with its principal place of business in Toronto, Ontario, Canada.  Defendant is a hotel management company, which manages and operates the well-known "Four Seasons" branded luxury hotels throughout the United States and the world.  Pursuant to a written contract, from 1987 to the present, Defendant has managed, and continues to manage, the HOTEL.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

## GENERAL ALLEGATIONS

7.      This is a case about an agent – Defendant – that has repeatedly breached its contractual obligations and abused its fiduciary trust by putting its own interests above BWH while Defendant has been in near total control over BWH's principal asset – the HOTEL – to unlawfully profit at BWH's expense.

8.      Plaintiffs contracted with Defendant for the exclusive use of the Four Seasons luxury hotel brand and operating systems within an 8-mile radius of the HOTEL.

9.      Defendant has breached the contract and its fiduciary duties by using the Four Seasons luxury brand and operating systems at another luxury hotel that is within one (1) mile of the HOTEL.

10.     Despite contrary representations to Plaintiffs, Defendant has admitted in public statements that it has converted the Beverly Wilshire Hotel (formerly a Regent brand hotel) into a full-fledged, Four Seasons branded hotel, which is tantamount to an admission that Defendant has breached the contract and abused its fiduciary duties.

11.     Plaintiffs do not seek to terminate the relationship with Defendant because it would undermine Plaintiffs long-standing investment in the HOTEL and the Four Seasons brand.

## THE PREEMINENT POSITION OF THE FOUR SEASONS BRAND IN THE LUXURY HOTEL BUSINESS

12.     The luxury hotel business is dependent upon the consuming public's willingness to pay a premium price for a very high standard of service, luxuriously appointed rooms and other high-quality amenities associated with a luxury hotel brand.

13.     The Four Seasons brand attracts customers who otherwise would not go to the hotel under another brand.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

14.   In the luxury hotel sector of the hospitality industry, the hotel brand is a primary factor driving occupancy, room rates and other sources of revenue for a hotel, including group sales (such as special events, weddings, bar mitzvahs, conferences and meetings) and highly valued corporate accounts.

15.   "Four Seasons" is the premier brand in the luxury hotel sector.

16.   In public reports, Defendant has described the Four Seasons brand as a "powerful global brand name that has become very valuable," allowing it to harness the brand name to "win market share."

17.   According to Defendant, "Four Seasons has become one of a handful of brand names in any industry that is now synonymous with uniqueness, value and excellence."

18.   Defendant has developed and enhanced the Four Seasons brand by requiring owners, including BWH, to invest substantially more in building and maintaining the hotels than other luxury hotel operators, so that the hotels have all of the luxury features necessary to maintain the image of the Four Seasons brand.

19.   Defendant requires owners to contribute millions of dollars to marketing efforts intended to reinforce the public's association of luxury and the highest level of service with the "Four Seasons" brand.

20.   Defendant requires that hotel owners pay hotel staff salaries and wages higher than other hotel brands to engender staff loyalty and to develop long-term relationships with repeat guests of the hotel.

21.   By so doing, Defendant has successfully linked in the minds of customers the Four Seasons brand with the highest level of a luxury hotel experience.

22.   Due to the power of the "Four Seasons" brand, Defendant can and does command higher management fees than other hotel management companies with less distinguished hotel brands.

200152234 v3

23.    BWH agreed to undertake the substantial initial and continuing investment in the HOTEL required by Defendant, and to pay Defendant premium management and other fees, in exchange for a long-term agreement that the HOTEL would be the only "Four Seasons" branded hotel in the Beverly Hills/West Los Angeles market.

24.    As described in greater detail below, the parties have contractually defined this broad concept of brand as the "FOUR SEASONS OPERATIONAL BENEFITS" (Exhibit B at p. 3.).

25.    Both the exclusivity and the use of the Four Seasons brand and operating systems within eight (8) miles of the HOTEL, as defined in the FOUR SEASONS OPERATIONAL BENEFITS, not only meant increased revenue for the HOTEL, but also (a) increased ground rent and market value for ACC's fee interest in the PROPERTY and (b) increased profits and market value for BWH's leasehold interest in, and improvements on, the PROPERTY.

## DEFENDANT'S FAILED EFFORT TO BUILD A FOUR SEASONS HOTEL IN BEVERLY HILLS

26.    Prior to 1985, Defendant did not manage a hotel in Los Angeles County and was desirous of establishing a Four Seasons hotel in the Beverly Hills/West Los Angeles market.

27.    Defendant desired to manage and operate a Four Seasons hotel to be built at the corner of Rodeo Drive and Wilshire Boulevard in Beverly Hills, California.

28.    Upon information and belief, in the early 1980s, Defendant began to seek, or assisted others in seeking, the necessary permits and entitlements to construct and manage a luxury hotel at the corner of Rodeo Drive and Wilshire Boulevard, across the street from the Beverly Wilshire Hotel.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

29.     Working with the owners of the property at the corner of Rodeo and Wilshire, Defendant sought a variance on a then-existing building height restriction in that area of Beverly Hills.

30.     Upon information and belief, after spending millions of dollars, Defendant and the developers who were working with Defendant were unsuccessful at changing the building height restriction, and Defendant abandoned its Beverly Hills development.

### BWH LTD DECIDES TO ENTER THE LUXURY HOTEL BUSINESS

31.     In the mid-1980s, BWH LTD decided to invest in the luxury hotel business.

32.     Since BWH LTD had no prior experience in the luxury hotel business, selecting the right hotel operator and brand was critical to BWH LTD.

33.     It is common for investors in luxury hotels to be experienced in real estate development but not experienced in the day-to-day operations of the hotels they own. As a result, many luxury hotels are not managed or operated by the hotel owners.  These owners retain experienced and trustworthy experts, hotel management companies like Defendant, to manage and operate the asset.

34.     BWH LTD leased the PROPERTY from ACC with the intention of constructing a luxury hotel.

35.     The luxury hotel BWH LTD intended to build would be BWH LTD's principal asset.

36.     At or around the same time Defendant abandoned its Beverly Hills project, BWH LTD was in the advanced planning stages of developing a luxury hotel on the PROPERTY.

37.     Defendant and BWH LTD opened discussions for Defendant to become BWH LTD's agent and, as such, manage and operate what would become the HOTEL.

200152234 v3

38.     Defendant knew that BWH LTD was new to the hotel business and that, if a deal was consummated, BWH LTD would be entrusting its primary asset to Defendant and relying completely on Defendant's expertise and reputation as a knowledgeable and trustworthy operator of luxury hotels to manage and operate the HOTEL.

## THE HOTEL MANAGEMENT AGREEMENT

39.     In 1985, BWH LTD and Defendant entered into a written hotel management agreement, whereby Defendant, in exchange for the payment of substantial base management fees, incentive fees, purchasing fees, reservation fees, marketing fees, and other valuable consideration, agreed to act as BWH LTD's agent and fiduciary to manage and operate the HOTEL for an initial term in excess of 50 years.

40.     BWH LTD undertook an initial investment in excess of $75 million to obtain the necessary entitlements from local governments and to construct the HOTEL to Four Seasons' high standards, which are higher than other hotel operators.

41.     The HOTEL opened for operation on April 17, 1987.

42.     There are currently eighty-three (83) Four Seasons brand hotels in the world managed by Defendant (not including the Beverly Wilshire Hotel).  On information and belief, Plaintiffs allege that only ten (10) of these hotels were managed by Defendant prior to April 17, 1987.

43.     In order to justify BWH LTD's substantial investment, BWH LTD bargained for and obtained a crucial long-term promise from Defendant that the HOTEL would be the only "Four Seasons" brand hotel in the Beverly Hills/West Los Angeles market and, within that restricted area, BWH LTD would have the exclusive right to benefit from Defendant's brand, management expertise, marketing, sales, purchasing, reservations and other operating systems.

44.     BWH LTD and Defendant entered into an Amended and Restated Hotel Management Agreement (the "HMA") in October 1989.

7

200152234 v3

45.     A true and correct copy of the HMA is attached hereto as Exhibit A.[1]

46.     In the HMA the parties agreed that Defendant would be BWH LTD's agent. (Exhibit A, Article VII).

47.     Defendant's agency under the HMA is "exclusive", and BWH LTD agreed that it had no right to supervise, direct the performance of, or discharge any HOTEL employee. (*Id.* at § 7.02).

48.     The HMA provided that Defendant would have the exclusive right to control the operation of the HOTEL: "Owner hereby engages Operator as the exclusive operator of the Hotel during the Operating Term with the exclusive responsibility and full control and discretion in the operation, direction, management and supervision of the Hotel and its staff, except as otherwise provided in this Agreement." (Exhibit A at § 5.01).

49.     The HMA further provided that Defendant "shall and may peaceably and quietly possess, manage and operate the HOTEL during the Operating Term, free from interruption or disturbance, except as contemplated by this Agreement or caused by [Defendant]." (Exhibit A at § 3.02.)

50.     From its opening until today, Defendant has controlled (and by contract is entitled to continue to control) nearly all aspects of the operation of the HOTEL, including but not limited to, the hiring, firing and supervision of HOTEL employees, the receipt of all HOTEL revenue, the cash flow, and nearly all activities on the PROPERTY, whether inside or outside of the HOTEL.

51.     As agent for BWH LTD, the HMA empowered Defendant to act in the name and on behalf of BWH LTD, including but not limited to:

        (a)     Create debts and liabilities for BWH LTD (Exhibit A at § 7.01);

---

[1] The HMA contains proprietary information, including but not limited to the fees and formulas for fees paid to Defendant. Such proprietary information is redacted from the copy of the HMA attached as Exhibit A. Additionally, the attached copy of the HMA does not include the schedules and exhibits referenced in the HMA.

200152234 v3

(b)    Represent to third parties that Defendant could legally bind BWH LTD (*Id.*);

(c)    Apply for and renew in BWH LTD's name all licenses and permits required for the operation of the HOTEL (*Id.* at § 5.02 (c));

(d)    Collect all charges, rents and other amounts due to the HOTEL from guests, patrons and others, including the authority to institute legal actions in BWH LTD's name (*Id.* at §§ 5.02 (d) and (p));

(e)    Employ, pay, supervise and discharge all personnel of the HOTEL, including the setting of salaries and bonuses, which BWH LTD was obligated to pay for and indemnify Defendant against (*Id.* at § 5.02 (e));

(f)    Enter into contracts with credit card providers and other contracts in BWH LTD's name (*Id.* at §§ 5.02(g) and 7.01);

(g)    Make purchases of food, beverages, equipment and other supplies of the HOTEL on the credit of BWH LTD (*Id.* at § 5.02(m));

(h)    Grant concessions for gift and sundries shops in the HOTEL (*Id.* at § 5.02 (r); and

(i)    Employ people to act as agents of BWH LTD and have BWH LTD be solely responsible for those agents actions (*Id.* at § 7.02).

52.    The HMA expressly provided that BWH LTD would have the exclusive right to the powerful Four Seasons brand. Specifically, in Section 26.01 of the HMA, Defendant promised that: "During the first fifteen (15) Fiscal Years of the Operating Term, [Defendant] shall not own, lease or operate a hotel within a radius of fourteen (14) miles from the HOTEL. At no time during the term of this Agreement shall [Defendant] own, lease, or operate a hotel within a radius of eight (8) miles from the HOTEL."

COMPLAINT
[Demand For Jury Trial]

200152234 v3

53.     The 8-mile radius restriction was a specially negotiated distance that was intended to encompass locations in the Los Angeles area deemed to be desirable for a luxury hotel.  On the East-West axis, the radius covers the western portion of downtown Los Angeles and all of the land west of the 110 (Harbor) Freeway to the Pacific Ocean. On the North-South axis, the radius includes all of the land from the 101 (Ventura) Freeway south to the northern boundary of Los Angeles International Airport.  Included in this radius are: the Cities of Santa Monica, Beverly Hills, West Hollywood and Culver City; Century City and Marina Del Rey; as well as the corridors of the 10 (Santa Monica), 101, 110, and 405 (San Diego) Freeways.  Throughout this Complaint, the area covered by the 8-mile radius will is referred to as the "Beverly Hills/West Los Angeles Market".

54.     The HMA also provides that Defendant "is hereby authorized and directed to and shall:  . . . (b) use all reasonable efforts consistent with a luxury-class hotel to maximize patronage and profitability of Hotel facilities; . . ."  (Exhibit A at § 5.02 (b).)

55.     Until 1992, Defendant led Plaintiffs to believe, and Plaintiffs did believe, that Defendant had honored the geographic restrictions on the use of the Four Seasons brand and its covenant to maximize patronage and profits of the HOTEL.

## DEFENDANT BEGINS TO MANAGE AND OPERATE A COMPETING LUXURY HOTEL WITHIN THE RESTRICTED RADIUS

56.     The Regent Beverly Wilshire Hotel (hereinafter, "REGENT BEVERLY WILSHIRE") is a luxury hotel located less than one-mile from the HOTEL (well within the applicable 8-mile restricted radius in the HMA).

57.     The REGENT BEVERLY WILSHIRE is also across the street from the site of Defendant's failed project at the corner of Rodeo Drive and Wilshire Boulevard.

58.     The REGENT BEVERLY WILSHIRE is a direct competitor of the HOTEL.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

59.     Prior to 1992, the REGENT BEVERLY WILSHIRE was operated and managed by Regent International Hotels Limited ("REGENT INTERNATIONAL") as the "Regent Beverly Wilshire Hotel."

60.     Prior to 1992, REGENT INTERNATIONAL was a hotel management company unrelated to Defendant.

61.     Prior to 1992, REGENT INTERNATIONAL was the owner of the "Regent" brand and managed luxury hotels under that brand.  In so doing, REGENT INTERNATIONAL used its own operating systems to support the "Regent" brand, including systems for reservations, purchasing, group sales, and marketing (together with the other aspects of the Regent brand, the "REGENT OPERATIONAL BENEFITS").

62.     Prior to 1992, REGENT OPERATIONAL BENEFITS were separate and distinct from the FOUR SEASONS OPERATIONAL BENEFITS.

63.     In or around 1992, with no advance notice to BWH LTD or ACC, Defendant acquired REGENT INTERNATIONAL.  At that time, REGENT INTERNATIONAL was managing and operating the REGENT BEVERLY WILSHIRE as the "Regent Beverly Wilshire Hotel," using the REGENT OPERATIONAL BENEFITS along with other Regent brand hotels.

64.     Soon thereafter, BWH LTD learned that Defendant began operating the REGENT BEVERLY WILSHIRE through Defendant's newly acquired subsidiary, REGENT INTERNATIONAL.

65.     BWH LTD informed Defendant that its management and operation of the REGENT BEVERLY WILSHIRE through REGENT INTERNATIONAL was a breach of its contractual and fiduciary obligations to BWH LTD by operating a competing hotel within the restricted radius.

200152234 v3

**DEFENDANT ADMITS ITS BREACH AND REAFFIRMS ITS PROMISE THAT BWH LTD WILL HAVE THE EXCLUSIVE RIGHT IN THE RESTRICTED RADIUS TO THE FOUR SEASONS BRAND AND OPERATING SYSTEMS**

66.    Defendant initially admitted that its operation of the REGENT BEVERLY WILSHIRE was a breach of the HMA, and its Chairman and Chief Executive Officer repeatedly promised that he would "make it right."

67.    Notwithstanding this admission, Defendant thereafter sought to avoid the breach by arguing that it indirectly acquired the management agreement for the REGENT BEVERLY WILSHIRE as part of a larger purchase of REGENT INTERNATIONAL, which included numerous "Regent" brand hotels.

68.    Defendant stated that it was only continuing to manage and operate the REGENT BEVERLY WILSHIRE through REGENT INTERNATIONAL, as a "Regent" brand hotel.

69.    Defendant assured BWH LTD that Defendant was using the REGENT OPERATIONAL BENEFITS only, in order to continue receiving revenue from the valuable management contract that it had indirectly acquired through its acquisition of REGENT INTERNATIONAL.

70.    On October 9, 1992, the parties entered into a Tolling Agreement, wherein BWH LTD agreed not to sue Defendant while the parties sought to resolve the dispute over Defendant's management of the REGENT BEVERLY WILSHIRE.

71.    From 1992 through 1998, with the Tolling Agreement in place, Defendant represented to Plaintiffs that Defendant, through an affiliate, continued to operate the REGENT BEVERLY WILSHIRE under the name "Regent Beverly Wilshire Hotel," using the REGENT OPERATIONAL BENEFITS, as the parties attempted to negotiate a resolution to Defendant's breach.

72.    During this time, Defendant's Chairman and Chief Executive Officer repeatedly told BWH LTD that Defendant only wanted to continue managing the

200152234 v3

1  REGENT BEVERLY WILSHIRE as a "Regent" hotel, using the REGENT

2  OPERATIONAL BENEFITS.

3      73.    He further told BWH LTD on numerous occasions that the HOTEL would

4  continue to have within the restricted radius the exclusive use of the FOUR SEASONS

5  OPERATIONAL BENEFITS (i.e., all of the things that make up the Four Seasons

6  brand).

7      74.    These assurances from Defendant were consistent with Defendant's

8  contemporaneous public statements about its acquisition of the Regent brand and

9  Defendant's use of the Regent's (as opposed to Four Seasons') operational benefits.

10      75.    In December 1996, Defendant announced publically its two-brand strategy

11  which included Defendant's decision to expand the Regent brand by entering into a

12  business arrangement with Carlson Hospitality Worldwide.

13      76.    At the time, Defendant operated nine Regent hotels, including the

14  REGENT BEVERLY WILSHIRE, under the Regent brand.  According to Defendant's

15  Chief Financial Officer, Defendant was seeking to expand the Regent brand because

16  "there are independent hotels in cities such as Paris and Zurich that will likely be willing

17  to affiliate with *the Regent's standards, sales and marketing*." (emphasis added).

18      77.    Confirming the separation of the FOUR SEASONS OPERATIONAL

19  BENEFITS and the REGENT OPERATIONAL BENEFITS, contemporaneous media

20  accounts of the business arrangement with Carlson Hospitality Worldwide stated that

21  "[t]he five-star Four Seasons brand, meanwhile, will remain under the control of the

22  company that founded it", while the Regent's staff, the people responsible for the

23  Regent brand and the REGENT OPERATIONAL BENEFITS, would remain at

24  Regent's headquarters in Hong Kong and would report to Defendant in Toronto.

25      78.    Defendant's private and public statements consistently affirmed that

26  Defendant would continue to advance the Regent brand and that the REGENT

27

28

13

COMPLAINT

[Demand For Jury Trial]

1   OPERATIONAL BENEFITS would remain separate from the Four Seasons' brand and

2   FOUR SEASONS OPERATIONAL BENEFITS.

3       79.     The continued exclusive right to the highly-coveted "Four Seasons" brand

4   and the Four Seasons operating systems, including Four Seasons' marketing, sales,

5   purchasing and reservations systems, was then (and remains today) essential to BWH

6   and ACC.

7       80.     Defendant understood the importance to BWH LTD and ACC of the

8   exclusivity of the Four Seasons brand and operating systems. BWH LTD had

9   committed to paying a premium for Defendant's management services and luxury hotel

10  brand, and undertook substantial investments to build, operate and maintain the

11  HOTEL, based on the value of having the only "Four Seasons" branded hotel in the

12  Beverly Hills/West Los Angeles Market.

13      81.     During the time leading up to, and at the time of, the 1998 AMENDMENT

14  (defined below), Defendant's Chief Executive Officer repeatedly assured BWH LTD

15  and ACC that Defendant's operation of the REGENT BEVERLY WILSHIRE would

16  not harm the HOTEL.

17      82.     Given that Defendant was (and remains) BWH LTD's fiduciary and the

18  leading operator in the luxury hotel business, Plaintiffs trusted and relied on the

19  statements by Defendant.

20      83.     Based on these assurances of Defendant that BWH LTD would not be

21  harmed and based on the relationship with Defendant, BWH LTD was willing to

22  accommodate Defendant's strong desire to preserve Defendant's management contract

23  with the owners of the REGENT BEVERLY WILSHIRE, but BWH LTD was very

24  concerned that it maintain the exclusive use of the Four Seasons brand and operating

25  systems within the restricted radius.

26      84.     BWH LTD entered into negotiations with Defendant to amend the HMA.

27

28

COMPLAINT
[Demand For Jury Trial]

200152234 v3

85.     During these negotiations, from 1992 to 1998 Defendant continued to receive substantial management fees and other fees from its management and operation of the REGENT BEVERLY WILSHIRE, and Defendant refused to give up the lucrative fees from this management contract.

86.     One of BWH LTD's concerns in negotiating an amendment to the HMA, was maintaining BWH LTD's exclusive right to the highly-valued Four Seasons brand and Four Seasons operating systems.

## THE PARTIES AMEND THE HMA TO, *INTER ALIA*, COMPENSATE BWH FOR DEFENDANT'S PRIOR BREACH AND TO REAFFIRM BWH'S EXCLUSIVE RIGHT TO THE "FOUR SEASONS OPERATIONAL BENEFITS" WITHIN THE RESTRICTED RADIUS

87.     On or about December 22, 1998, BWH LTD, ACC and Defendant entered into the First Amendment to the Amended and Restated Hotel Management Agreement for the Four Seasons Hotel, Los Angeles (the "1998 AMENDMENT").   A true and correct copy of the 1998 AMENDMENT is attached hereto as Exhibit B.[2]  (The 1998 AMENDMENT together with the HMA will be referred to as the "AMENDED HMA").

88.     BWH LTD and ACC entered into the 1998 AMENDMENT to, among other reasons:  (a) obtain compensation for Defendant's breach of the HMA and (b) protect the HOTEL from possible harm from Defendant's operation of the REGENT BEVERLY WILSHIRE.

89.     Defendant's stated objectives in entering into the 1998 AMENDMENT were: (a) to obtain a limited exception to the strict radius restriction in the HMA to allow REGENT INTERNATIONAL (Defendant's Restricted Affiliate) to continue to

---

[2] The 1998 AMENDMENT contains proprietary information, which has been redacted in the copy attached hereto as Exhibit B.  Additionally, the attached 1998 AMENDMENT does not include schedules and exhibits referenced in the 1998 AMENDMENT.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

1  earn the income stream from REGENT INTERNATIONAL's management of the

2  REGENT BEVERLY WILSHIRE using the REGENT OPERATIONAL BENEFITS

3  and (b) to pursue its two-brand strategy in the luxury hotel market.

4       90.    In essence, in exchange for compensation to BWH LTD and assurances

5  about its exclusive use of the FOUR SEASONS OPERATIONAL BENEFITS,

6  Defendant was allowed to continue managing the REGENT BEVERLY WILSHIRE in

7  the same manner as Defendant then claimed it was (with the REGENT

8  OPERATIONAL BENEFITS), but Defendant was strictly and expressly prohibited

9  from allowing the REGENT BEVERLY WILSHIRE to benefit from the Four Seasons

10 distinctive brand as reflected in the FOUR SEASONS OPERATIONAL BENEFITS.

11     **New Section 26.01(a) Creates An Absolute Prohibition**

12      91.    In the original HMA, Section 26.01 created a radius restriction for the

13 exclusive use of the Four Seasons brand and the operating systems used by Defendant to

14 manage the HOTEL.  At the time the HMA was signed, there was no need to define

15 with particularity the categories of things that comprise the Four Seasons brand and

16 operating systems because the HOTEL was not only the sole Four Seasons branded

17 hotel in Los Angeles County but also the only hotel of any brand Defendant could

18 manage in the restricted area.

19      92.    After the breach in 1992, and given BWH LTD's desire to protect its

20 exclusive use of the Four Seasons brand and operating systems within the restricted

21 area, the parties expressly defined, as the FOUR SEASONS OPERATIONAL

22 BENEFITS, categories of items that made up the Four Seasons brand and operating

23 systems.

24      93.    To ensure no misunderstanding about BWH LTD's rights within the

25 restricted area, the 1998 AMENDMENT defined "Four Seasons Operational Benefits"

26 to mean "any of the following, as existing now or from time to time hereafter:  (1) any

27 of the names 'Four Seasons,' 'Le Quatre Saisons' or 'Inn on the Park' or any of

28

COMPLAINT
[Demand For Jury Trial]

200152234 v3

1  [Defendant's] trade names, trademarks, distinctive emblems, insignia, logos, slogans or

2  distinguishing characteristics; (2) participation in any of the central reservations,

3  purchasing or sales and marketing systems providing services for hotels in the system of

4  hotels operated under the 'Four Seasons' name; or (3) the services of [Defendant's]

5  senior management personnel if such services in (3) are material, ongoing and provided

6  on a contractual basis." *Id.* (herein, "FOUR SEASONS OPERATIONAL

7  BENEFITS").

8      94.    Thus, Section 26.01(a) of the 1998 AMENDMENT prohibited Defendant

9  from using within the 8-mile restricted radius nine (9) different categories that make up

10  the Four Seasons brand and operating systems:

11          (a)    "Trade Names" used by Four Seasons Hotels;

12          (b)    "Trademarks" used by Four Season Hotels;

13          (c)    "Distinctive emblems, insignia, logos and slogans" used by Four

14                 Seasons Hotels;

15          (d)    "Distinguishing characteristics" of Four Seasons Hotels;

16          (e)    Defendant's central reservations system for Four Seasons Hotels;

17          (f)    Defendant's purchasing system for Four Seasons Hotels;

18          (g)    Defendant's group sales system for Four Seasons Hotels;

19          (h)    Defendant's marketing system for Four Seasons Hotels; and

20          (i)    The services of Defendant's Senior Management Personnel, if

21                 material, ongoing and provided on a contractual basis.

22      95.    FOUR SEASONS OPERATIONAL BENEFITS was intended to represent

23  and describe the general concept of "brand", such that any "distinguishing

24  characteristics" of a Four Seasons hotel are reserved for BWH LTD's exclusive use in

25  the restricted area.

26      96.    Moreover, the definition of FOUR SEASONS OPERATIONAL

27  BENEFITS was not static.  It included all of the above nine (9) categories "as existing

28

200152234 v3

now or from time to time hereafter".   Thus, as Defendant modified, added or augmented the FOUR SEASONS OPERATIONAL BENEFITS, the HOTEL would have the exclusive use in the restricted area.

97.    In addition to the definition of FOUR SEASONS OPERATIONAL BENEFITS, old Section 26.01 was revised and divided into four parts.[3]

98.    Subsection 26.01 (a) in the 1998 AMENDMENT sets forth an absolute prohibition:  "At no time during the term of this Agreement shall [Defendant] or any Restricted Affiliate directly or indirectly [i] own, [ii] lease, [iii] manage or operate in whole or in part or [iv] contract or license any of the FOUR SEASONS OPERATIONAL BENEFITS for use in connection with any hotel within a radius of eight (8) miles of the Hotel."  (Exhibit B at p. 3.)

99.    The prohibition includes four separate and distinct activities within the restricted geographical area:

      (a)    Owning another hotel;

      (b)    Leasing another hotel;

      (c)    Managing or operating another hotel; and

      (d)    Contracting or licensing any of the FOUR SEASONS OPERATIONAL BENEFITS for use at another hotel. (hereinafter, the "FOUR PROHIBITED ACTIVITIES")

100.    Thus, the parties agreed that the third prohibited activity listed above, managing or operating another hotel, is distinct from and does not include owning or leasing another hotel or, the fourth prohibited activity, contracting or licensing of any of the FOUR SEASONS OPERATIONAL BENEFITS for use another hotel.

101.    The express prohibition of Section 26.01 (a) of the 1998 AMENDMENT and the defined term FOUR SEASONS OPERATIONAL BENEFITS were designed to

---

[3] Hereafter we set forth the terms of subsections 26.01 (a), (b), and (d). Subsection (c) is not relevant to Plaintiffs' causes of action.

200152234 v3

ensure BWH LTD's exclusive use of the Four Seasons brand and operating systems within the restricted area.

102.   Consistent with its representations to BWH LTD and public statements prior to the 1998 AMENDMENT that Defendant was operating the REGENT BEVERLY WILSHIRE as a Regent branded hotel, Defendant represented and warranted in Section 26.01 (b) of the 1998 AMENDMENT:  Defendant "hereby represents and warrants that as of the date hereof a wholly owned subsidiary of FSR International Hotels Limited (formerly Regent International Hotels Limited) (such subsidiary is referred to as 'Regent') is the manager of the Beverly Wilshire Hotel and that Regent is a Restricted Affiliate of [Defendant] and that the interests of [Defendant] and any Restricted Affiliates in the [REGENT BEVERLY WILSHIRE] are in compliance with the foregoing provisions."  (Exhibit B at p. 5.)

**Section 26.01(b) Granted Limited Exceptions to the Absolute Prohibition**

103.   Subsection (b) of the Section 26.01 in the 1998 AMENDMENT then set forth limited, narrow exceptions to the general prohibition in subsection (a), which Defendant, as a fiduciary, specifically represented to BWH LTD that such exceptions would not harm the HOTEL.

**Exception to the FOUR PROHIBITED ACTIVITIES**

104.   In reference to ¶¶ 98-99 above, the first exception allowed Defendant to "manage or operate" a "Second Hotel" within the restricted zone under certain conditions.[4]

105.   This exception did not permit Defendant to engage in three of the FOUR PROHIBITED ACTIVITIES in the restricted radius, namely:  (1) own another hotel; (2)

---

[4] 1.   The term "Second Hotel" is defined as "the existing single hotel now known as The Regent Beverly Wilshire," for as long as Defendant was affiliated with that hotel.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

1    lease another hotel; or (3) contract or license any of the FOUR SEASONS

2    OPERATIONAL BENEFITS for use in connection with another hotel.

3        106.   In essence, this exception to the FOUR PROHIBITED ACTIVITIES was

4    intended to address the breach of the HMA by allowing Defendant to continue

5    "managing and operating" the REGENT BEVERLY WILSHIRE hotel purportedly in

6    the same manner as it had been for the six years prior, under the "Regent" brand name

7    and using the REGENT OPERATIONAL BENEFITS.

8        **Limited Use of One Trade Name**

9        107.   Section 26.01 (b) of the 1998 AMENDMENT permits Defendant a limited

10   exception to use only <u>one</u> of the Defendant's trade names and then only in a smaller font

11   as a "by line" to the name of the REGENT BEVERLY WILSHIRE.  It does not allow

12   the use of any other name, trademark or other indicia of the Four Seasons brand.

13       108.   Specifically, with respect to this exception, Subsection 26.01 (b) states that,

14   while the REGENT BEVERLY WILSHIRE "shall never be called a 'Four Seasons

15   Hotel' or utilize the logo of Four Seasons as part of such hotel's name," the REGENT

16   BEVERLY WILSHIRE could carry a by-line after its name containing the words "Four

17   Seasons," to indicate that the hotel was managed by Defendant.  (Exhibit B at pp. 4-5

18   and Schedule 1.)  Schedule 1 to the 1998 AMENDMENT contains the following

19   example of a by-line that complied with this provision.



24   **Contingent Exception to Use Four Seasons Central Reservation System**

25       109.   Subsection 26.01(b) permitted Defendant, under certain limited

26   circumstances, to use the Four Seasons "central reservation system" for the REGENT

27   BEVERLY WILSHIRE.  Specifically, BWH LTD agreed that, in the event the

28

200152234 v3

REGENT BEVERLY WILSHIRE was required to change its name (i.e. could no longer use the name "Regent"), and after Defendant's reasonable efforts to prevent a name change, the REGENT BEVERLY WILSHIRE may be given access to the Four Seasons central reservation system. The Four Seasons central reservation system is only one of the many Four Seasons' operating systems that were defined to be part of the FOUR SEASONS OPERATIONAL BENEFITS.

110. At the time of the 1998 AMENDMENT, although the parties believed that the Four Seasons central reservation system was better and more highly regarded than reservation systems used by Regent or other luxury hotel brands, Regent had a viable central reservation system that Defendant had been using for six years. Moreover, Defendant, along with Carlson Hospitality Worldwide, touted its intention to expand the Regent brand and operating systems by recruiting independent luxury hotels around the world to join.

111. This exception was included because Defendant represented that if, as a result of a forced or involuntary name change, the Regent central reservations system was no longer available for REGENT INTERNATIONAL to use in managing the REGENT BEVERLY WILSHIRE, it was not economical for Defendant to create a new central reservation system separate from the Four Seasons central reservation systems.

112. It was understood by the parties that the unavailability of the Regent central reservation system would be the unlikely result of some then unforeseeable event, which Defendant did not control either directly or indirectly, that caused a change in the name of the REGENT BEVERLY WILSHIRE.

113. It was never the intent that the use of the Four Seasons central reservation system at the REGENT BEVERLY WILSHIRE could be triggered by a name change brought about as a result of a voluntary or strategic choice or scheme by Defendant.

114. Indeed, Defendant represented to BWH LTD that Defendant did not control by contract or otherwise the name of the REGENT BEVERLY WILSHIRE.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

115.   In an effort to address BWH LTD's concern, in Subsection 26.01 (b) Defendant promised that it would use reasonable efforts to ensure that the REGENT BEVERLY WILSHIRE would continue to be called the "The Regent Beverly Wilshire Hotel." (Exhibit B at p. 5.)

116.   As a result, BWH LTD was led to believe by Defendant that a condition precedent for the triggering of this exception would be that the Regent brand and Regent central reservation system would have to be unavailable for use at the REGENT BEVERLY WILSHIRE for reasons beyond Defendant's control.

117.   The exceptions in subsection 26.01(b) are limited relative to the broad prohibition in subsection 26.01 (a).  Out of the FOUR PROHIBITED ACTIVITIES, the exceptions permit Defendant to:

(a)   Manage and operate another hotel within eight (8) miles of the HOTEL;

(b)   Use only one of a number of trade names in smaller font as a by-line to the name, "The Regent Beverly Wilshire Hotel"; and

(c)   Permit the REGENT BEVERLY WILSHIRE to use the Four Seasons central reservation system, but only if events beyond Defendant's control caused the Regent reservation system to be unavailable and the word "Regent" was no longer part of the REGENT BEVERLY WILSHIRE's name.

(hereinafter, "the PERMITTED OPERATIONAL BENEFITS").

118.   By design, the PERMITTED OPERATIONAL BENEFITS were so limited and restricted that they would not diminish the value of BWH LTD's exclusive use of the FOUR SEASONS OPERATIONAL BENEFITS in the Beverly Hills/ West Los Angeles Market.

119.   Additionally, if Defendant stopped managing and operating the REGENT BEVERLY WILSHIRE as the "Second Hotel" defined in Subsection 26.01 (b) and

200152234 v3

1   wished to substitute another hotel within the restricted radius as the "Second Hotel",

2   Defendant was only permitted to do so if the REGENT BEVERLY WILSHIRE was

3   completely cut off from Defendant.

4       120.   Specifically, Defendant could manage and operate a "Second Hotel" other

5   than the REGENT BEVERLY WILSHIRE if, "(a) neither [Defendant] nor any

6   Restricted Affiliate . . . has or owns any interest . . . in all or part of the existing

7   hotel now known as The Regent Beverly Wilshire and (b) such hotel does not, at such

8   time or thereafter, use or license nor is permitted to use or license **_any_** of the Four

9   Seasons Operational Benefits . . .."  (Exhibit B at p. 2 [emphasis added].)

10      121.   Thus, because it was possible for Defendant to use two of the FOUR

11  SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE (one

12  trade name and, under certain conditions, the central reservation system), BWH LTD

13  required that "any" Four Seasons benefits that had been given to the REGENT

14  BEVERLY WILSHIRE had to be taken away before Defendant could substitute a new

15  "Second Hotel"

16      122.   Under the strict prohibition in Subsection 26.01 (a), the Defendant could

17  never do any of the following FOUR PROHIBITED ACTIVITIES under any

18  circumstances within eight (8) miles of the HOTEL, including at the REGENT

19  BEVERLY WILSHIRE:

20          (a)     Own another hotel;

21          (b)     Lease another hotel; and

22          (c)     Use any of the following FOUR SEASONS OPERATIONAL

23                  BENEFITS at another hotel

24                      (1)  "Trade Names" used by Four seasons Hotels (other than the

25                          by-line mentioned in ¶ ¶ 107-108 above);

26                      (2)  "Trademarks" used by Four Season Hotels;

27

28

200152234 v3

(3) "Distinctive emblems, insignia, logos and slogans" used by Four Seasons Hotels;

(4) "Distinguishing characteristics" of Four Seasons Hotels;

(5) Defendant's central reservations system for Four Seasons Hotels (other than as described in ¶¶ 109-116 above);

(6) Defendant's purchasing system for Four Seasons Hotels;

(7)  Defendant's group sales system for Four Seasons Hotels; and

(8) Defendant's marketing system for Four Seasons Hotels.[5]

123.  The 1998 AMENDMENT also increased the term of the HMA from 55 years to 75 years.

124.  Additional consideration Defendant received for the 1998 AMENDMENT was the right to continue to receive the management fees from the owners of the REGENT BEVERLY WILSHIRE, which contract Defendant valued, in the early 1990s, at an amount in excess of $35 million.

125.  The consideration BWH LTD received for the 1998 AMENDMENT (approximately $7.5 million in forgiven loan principal plus accrued interest, which accrued largely after Defendant's breach of the HMA in 1992 and while Defendant was receiving millions of dollars of revenue annually from the REGENT BEVERLY WILSHIRE management contract) was adequate at the time for allowing Defendant the right to the limited activity of managing and operating the REGENT BEVERLY WILSHIRE within the restricted radius as a non-Four Seasons branded hotel.

126.  Such consideration to Plaintiffs would have been woefully inadequate to compensate Plaintiffs for the loss of the exclusive use of all of the FOUR SEASONS OPERATIONAL BENEFITS, which would lead to losses of revenue over the

---

[5] The category of Defendant's senior personnel is not included in this list because Subsection 26.01 (b) created an exception (not at issue here) about the use of the services of such personnel at the REGENT BEVERLY WILSHIRE.

200152234 v3

1  remaining 64-year contract term and the diminution of the market value of the fee and

2  leasehold interests in the PROPERTY caused by having an identically branded,

3  competing luxury hotel less than one mile away.

4  **Defendant Agrees to Permit Injunctive Relief in a Court of Law**

5      127.   In Subsection 26.01 (d), Defendant agreed that "[BWH LTD] shall have

6  the right (which right shall survive the termination of the Agreement) to seek a

7  temporary and/or permanent injunction or other relief as may be available at law or in

8  equity by way of arbitration and/or in a court of competent jurisdiction to enforce the

9  foregoing provisions of this Section 26.01, notwithstanding the arbitration provisions or

10  the other contained in the Agreement." (Exhibit B at p. 6.)

11      128.   In so agreeing, Defendant recognized the value to Plaintiffs of the

12  exclusive use of the FOUR SEASONS OPERATIONAL BENEFITS and the harm that

13  Plaintiffs would suffer if that use was impaired. Defendant expressly acknowledged and

14  agreed that "in the event of a breach of Section 26.01 by [Defendant] pecuniary

15  compensation would not afford adequate relief to BWH and/or it would cause great and

16  irreparable injury to BWH and would be extremely difficult to ascertain the amount of

17  compensation which would afford adequate relief to BWH, and accordingly,

18  notwithstanding anything to the contrary herein or elsewhere including any statutory

19  laws, BWH shall be entitled to obtain temporary and final injunctive relief in order to

20  enforce Section 26.01 in the event of such breach or to prevent a breach."

21

22  **DEFENDANT BREACHES THE 1998 AMENDMENT AND ITS FIDUCIARY**

23  **OBLIGATIONS TO BWH**

24      129.   Based on public information and statements by Defendant, after the 1998

25  AMENDMENT Defendant initially continued to manage and operate the REGENT

26  BEVERLY WILSHIRE purportedly in the manner contemplated by the Amended HMA

27  – as a "Regent" hotel, using the "REGENT OPERATIONAL BENEFITS."

28

200152234 v3

130.   As far as Plaintiffs knew, based on Defendant's statements to Plaintiffs and public statements, Defendant's affiliate REGENT INTERNATIONAL pursued a corporate strategy to expand the Regent brand by adding hotels to that brand.

131.   Sometime later, at a time unknown to Plaintiffs, Defendant adopted a different corporate strategy for the Regent hotels it managed.  Specifically, even though the Regent brand and operating systems continue to exist and function, Defendant abandoned its effort to expand the Regent chain of hotels and adopted a plan to convert the REGENT BEVERLY WILSHIRE, along with select other hotels in the "Regent" chain, to full-fledged "Four Seasons" branded hotels with unrestricted access to all of the FOUR SEASONS OPERATIONAL BENEFITS.

132.   In so doing, Defendant breached its fiduciary duties to BWH LTD's by putting Defendant's interests above the interests of BWH LTD.

133.   Defendant knew that use of the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE, instead of the lesser valued REGENT OPERATIONAL BENEFITS, would allow Defendant to obtain for itself and the owners of the REGENT BEVERLY WILSHIRE substantial benefits at BWH's expense.  Moreover, Defendant knew that the "Four Seasons" powerful name and marketing and sales systems would drive events and corporate accounts that would have otherwise gone to BWH's HOTEL to the REGENT BEVERLY WILSHIRE.  Defendant knew that if it delivered these FOUR SEASONS OPERATIONAL BENEFITS to the owner of the REGENT BEVERLY WILSHIRE, then in turn Defendant and the owner of the REGENT BEVERLY WILSHIRE would wrongfully receive substantial benefits to the detriment of Plaintiffs.

134.   In addition, since its failure in the mid-1980s to construct a Four Seasons hotel at the corner of Rodeo Drive and Wilshire Boulevard in Beverly Hills, Defendant strongly desired to operate and manage a Four Seasons branded hotel on that corner.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

135.   In short, Defendant knew that, if it breached the 1998 AMENDMENT by operating the REGENT BEVERLY WILSHIRE as a fully branded Four Seasons hotel with all of the FOUR SEASONS OPERATIONAL BENEFITS:  Defendant would (a) reap substantial benefits for itself and the owner of the REGENT BEVERLY WILSHIRE at BWH's expense; (b) convert BWH's local investment in the Four Seasons brand to Defendant's own benefit; and (c) achieve its coveted goal of operating a Four Seasons branded  hotel at the corner of Rodeo Drive and Wilshire Boulevard.

136.   In 2002, Defendant informed BWH LTD that the owner of the REGENT BEVERLY WILSHIRE was going to change the name of its hotel and, as a result, Defendant was going to put the REGENT BEVERLY WILSHIRE in the Four Seasons central reservation system.

137.   Defendant did not disclose that it had in fact made a strategic business decision to abandon or depart from its efforts to support and grow the Regent brand.

138.   Defendant refused to reveal whether or how Defendant had complied with its express obligation to use reasonable efforts to prevent the proposed name change.

139.   In 2002, BWH protested the name change, and for reasons unknown to BWH, the name remained the REGENT BEVERLY WILSHIRE.

140.   Further, according to Defendant the REGENT BEVERLY WILSHIRE did not use the Four Seasons central reservation system.  Defendant without BWH's consent, did list the REGENT BEVERLY WILSHIRE on the Four Seasons web site, but Defendant assured BWH that the Four Seasons web site was not a part of the Four Seasons central reservation system.

141.   Based on information and belief, Plaintiffs allege that, as part of the Defendant's strategic plan to abandon the Regent brand:

(a)   On June 1, 2002, Defendant converted the Regent Sydney Hotel in Australia to a Four Seasons brand hotel;

COMPLAINT
[Demand For Jury Trial]

200152234 v3

(b)  In 2003, Defendant rebranded two "Regent" hotels in Bangkok and Chiang Mai as the "Four Seasons Hotel Bangkok" and the "Four Seasons Resort Chiang Mai," respectively; and

(c)  On July 14, 2004, Defendant converted the Regent Jakarta Hotel in Indonesia to a Four Seasons brand hotel.

142.   All of these hotels were operated by Defendant's affiliate under the "Regent" brand prior to 2002.

143.   In or around 2004, BWH learned that Defendant was breaching the 1998 AMENDMENT and its fiduciary obligations to BWH by providing the REGENT BEVERLY WILSHIRE with FOUR SEASONS OPERATIONAL BENEFITS reserved exclusively for BWH.

144.   On May 12, 2004, Plaintiffs and Defendant entered into a Standstill Agreement, which (effective as of June 4, 2002) tolled the running of applicable statutes of limitation periods in exchange for Plaintiffs' agreement not to bring and to delay bringing claims against Defendant.  The Standstill Agreement remained in place until December 31, 2010.

**Defendant Announces the Rebranding of the REGENT BEVERLY WILSHIRE as a Full-Fledged Four Seasons Hotel**

145.   In 2006, Defendant announced that it had completed a 15-year plan to rebrand the REGENT BEVERLY WILSHIRE as a full-fledged "Four Seasons" hotel.

146.   In a September 2006 press release, Defendant's President of Worldwide Hotel Operations admitted the improper use of the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE, when he stated "For fifteen years, Four Seasons has managed this iconic property *and successfully embodied Four Seasons operating and cultural standards* by offering guest experiences of exceptional quality in the heart of Beverly Hills." (Emphasis added.).

200152234 v3

147.   In that same press release, Defendant's President announced the completion of Defendant's plan.  He stated that, after fifteen years of managing the REGENT BEVERLY WILSHIRE, "[t]he Hotel's name change [to Beverly Wilshire, a Four Seasons Hotel] and a magnificent $35 million renovation marks the completion of a full transition of the Hotel to the Four Seasons portfolio."

148.   In other words, notwithstanding the strict prohibition of the use of the FOUR SEASONS OPERATIONAL BENEFITS as described above, in 2006 (and perhaps earlier) Defendant began to use Four Seasons' trade names, trademarks, logos, emblems, slogans and other "distinguishing characteristics" of a Four Seasons hotel (¶94 (a) through (d) above) at the REGENT BEVERLY WILSHIRE, all in violation of the 1998 AMENDMENT.  In addition, Defendant began using Four Seasons operating systems at the REGENT BEVERLY WILSHIRE," including but not limited to group sales, central reservations, marketing and purchasing (¶94 (e) through (h) above), which by contract Defendant was expressly required to use exclusively for BWH's benefit.

149.   The effect of this breach is:  (a) to eliminate the uniqueness of the HOTEL; (b) to drive customers away from the HOTEL to the competing REGENT BEVERLY WILSHIRE; (c) to create confusion in the Beverly Hills/West Los Angeles Market about "Fours Seasons" hotels; (d) to convert BWH's asset, the goodwill built up over many years at the HOTEL, for the benefit of Defendant and the owner of the REGENT BEVERLY WILSHIRE; (e) to decrease the market value of the HOTEL and the PROPERTY (both the fee and leasehold interests); and (f) to improperly grant Defendant a Four Seasons branded hotel at the location Defendant originally coveted, the corner of Rodeo Drive and Wilshire Boulevard in the City of Beverly Hills.

150.   Meanwhile, at the same time as Defendant was converting the REGENT BEVERLY WILSHIRE and other select "Regent" hotels to full-fledged "Four Seasons" hotels, Defendant continued to operate and manage other "Regent" hotels under the

COMPLAINT
[Demand For Jury Trial]

200152234 v3

"Regent" brand and REGENT OPERATIONAL BENEFITS (including Regents' central reservation system).

151.   Specifically, Defendant continues to manage Regent brand hotels in Singapore and Taipei.

152.   On information and belief, as of this date, other luxury hotels are operating under the Regent brand and REGENT OPERATIONAL BENEFITS, including Regent's central reservation system.

153.   As of today, in operating the REGENT BEVERLY WILSHIRE, Defendant can use the Regent Brand (which was and is available for Defendant's use), another hotel brand or no brand at all (i.e., operate the Beverly Wilshire as an independent hotel).

154.   While the 1998 AMENDMENT does not require Defendant to use the Regent brand and operating systems at the REGENT BEVERLY WILSHIRE, it does prohibit Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS at that hotel.

155.   Thus, at the time that Defendant rebranded the REGENT BEVERLY WILSHIRE, Defendant was contractually prohibited from using the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE.  Rather than continue to operate and manage the REGENT BEVERLY WILSHIRE in the same manner, as a "Regent" hotel using the REGENT OPERATIONAL BENEFITS, Defendant nonetheless willfully chose to breach its contractual obligations to BWH and ACC and its fiduciary obligations to BWH in order to benefit itself and the owners of the REGENT BEVERLY WILSHIRE by expanding Defendant's portfolio of Four Seasons branded hotels at BWH's expense.

156.   As a result of Defendant's willful and continued breaches of its contractual and fiduciary duties, BWH has suffered substantial damages and will continue to suffer irreparable harm in the future because BWH no longer enjoys the exclusive use of the

COMPLAINT
[Demand For Jury Trial]

200152234 v3

Four Seasons brand and FOUR SEASONS OPERATIONAL BENEFITS in the Beverly Hills/West Los Angeles Market. Such damages and harm include, but are not limited to, a significant reduction in the income generated for BWH by the HOTEL, the transfer of goodwill belonging to BWH, and a considerable diminution of the market value of the leasehold and the improvements thereon, including the HOTEL.

157.   As a result of Defendant's willful and continued breaches of its contractual obligations, ACC has suffered substantial damages and will continue to suffer irreparable harm in the future including, but not limited to, a reduction in past and future ground lease payments, which in part are based on the revenue received by the HOTEL, and a diminution of the market value of its fee interest in the PROPERTY.

158.   Plaintiffs are threatened by Defendant's ongoing and near-certain future violations of its contractual and fiduciary obligations. As such, Plaintiffs will continue to suffer irreparable harm to their property and investments in the future unless Defendant is permanently enjoined from breaching the AMENDED HMA.

## TOLLING OF STATUTE OF LIMITATIONS

159.   On or about May 12, 2004, the parties entered into a Standstill Agreement (the "STANDSTILL AGREEMENT"). Under the STANDSTILL AGREEMENT, the Defendant agreed to toll the statute of limitations on all of the Plaintiffs' claims existing as of June 4, 2002, until the expiration of the STANDSTILL AGREEMENT. Pursuant to subsequent amendments, the STANDSTILL AGREEMENT remained in effect until it was terminated by Plaintiffs on December 31, 2010.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

### (BWH LTD and BWH LLC v. Defendant)

160.   BWH reasserts and incorporates herein by reference the allegations contained in Paragraphs 1 through 159 above.

161.   BWH LTD and Defendant entered into a valid contract, the AMENDED HMA.  BWH LLC is the assignee of the AMENDED HMA.

162.   BWH has performed all of the terms and conditions required of it under the AMENDED HMA, except as excused by Defendant's breach.

163.   Defendant has breached the 1998 AMENDMENT, including but not limited to, by:

    (i)    Providing, licensing, contracting or otherwise allowing the use of the FOUR SEASONS OPERATIONAL BENEFITS (other than the by-line) to the REGENT BEVERLY WILSHIRE in breach of section 26.01of the 1998 AMENDMENT.

    (ii)    Failing to use reasonable efforts to prevent the REGENT BEVERLY WILSHIRE from changing its name from "The Regent Beverly Wilshire." in violation of Section 26.01(b) of the 1998 AMENDMENT;

    (iii)    Providing, licensing, contracting or otherwise allowing the use of the FOUR SEASONS OPERATIONAL BENEFITS to the REGENT BEVERLY WILSHIRE after the word "Regent" was dropped from the name REGENT BEVERLY WILSHIRE, in violation of Section 26.01(b) of the 1998 AMENDMENT; and

    (iv)    Failing to use "all reasonable efforts consistent with a luxury-class hotel to maximize the patronage and profitability of" the HOTEL, pursuant to Section 5.02(b) of the AMENDED HMA.

200152234 v3

164.   As a result of these and other breaches, Defendant has wrongfully denied BWH the benefits BWH was to receive under the Amended HMA, including but not limited to lost revenue and a diminution of the market value of BWH's HOTEL and leasehold interest in the PROPERTY.

165.   BWH has been damaged as a result of Defendant's breaches in an amount in excess of $75,000, the exact amount to be proven at trial.

166.   Pursuant to Section 26.01 (d) of the 1998 AMENDMENT, unless Defendant is permanently enjoined from committing future breaches of the AMENDED HMA, BWH will continue to suffer damages in the future.  Such continuances and repeated harm is irreparable because Plaintiffs would be forced to file serial lawsuits periodically throughout the remainder of the 75-year term of the AMENDED HMA to recover ongoing and future losses.

## SECOND CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (BWH LTD and BWH LLC v. Defendant)

167.   BWH reasserts and incorporates herein by reference the allegations contained in Paragraphs 1 through 166 above.

168.   Implicit in the contract between BWH and Defendant was a covenant that the Defendant would use its best efforts to give effect to the terms of the AMENDED HMA.

169.   This implied covenant required Defendant to act in good faith at all times in an attempt to ensure that BWH received the benefits of the AMENDED HMA.

170.   Defendant breached this implied covenant of good faith and fair dealing by deliberately acting to deprive BWH of the benefits of the AMENDED HMA by, among other things:

200152234 v3

(i)    Using the FOUR SEASONS OPERATIONAL BENEFITS, which were promised exclusively to BWH in the restricted radius, to compete with the HOTEL and to benefit Defendant's own financial interest and the REGENT BEVERLY WILSHIRE;

(ii)    Failing to act in good faith to prevent the REGENT BEVERLY WILSHIRE from changing its name from "The Regent Beverly Wilshire.";

(iii)    Depriving BWH of the exclusive right within the restricted area to use and benefit from the FOUR SEASONS OPERATIONAL BENEFITS after the word "Regent" was dropped from the name of the REGENT BEVERLY WILSHIRE; and

(iv)    Failing to use "all reasonable efforts consistent with a luxury-class hotel to maximize the patronage and profitability of" the HOTEL, pursuant to Section 5.02(b) of the AMENDED HMA.

171.   BWH has been damaged as a result of Defendant's breaches in an amount in excess of $75,000, the exact amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract - Damages)

### (ACC v. Defendant)

172.   ACC reasserts and incorporates herein by reference the allegations contained in Paragraphs 1 through 171 above.

173.   The AMENDED HMA requires Defendant to make rent payments to ACC. (Exhibit A at § 10.08 (d).)

COMPLAINT
[Demand For Jury Trial]

200152234 v3

174.   Defendant knows that the ground rent due to ACC is based in part on the revenue received by the HOTEL.

175.   Pursuant to Sections 1.01 (aa) and (bb) and 26.13 of the AMENDED HMA, ACC, as "Lessor", is an express third-party beneficiary of the AMENDED HMA.

176.   ACC has performed all of the terms and conditions required of it under the lease and the AMENDED HMA, except as excused by Defendant's breach.

177.   Defendant has breached the AMENDED HMA in a way that has substantially reduced the revenue of the HOTEL, which in turn has improperly decreased the amount of ground rent ACC has received and the market value of the PROPERTY by, among other things:

      (i)    Providing, licensing, contracting or otherwise allowing the use of the FOUR SEASONS OPERATIONAL BENEFITS to the REGENT BEVERLY WILSHIRE in breach of section 26.01 of the 1998 AMENDMENT;

      (ii)    Failing to use reasonable efforts to prevent the REGENT BEVERLY WILSHIRE from changing its name from "The Regent Beverly Wilshire," in violation of Section 26.01(b) of the 1998 AMENDMENT;

      (iii)    Providing, licensing, contracting or otherwise allowing the use of the FOUR SEASONS OPERATIONAL BENEFITS to the REGENT BEVERLY WILSHIRE after the word "Regent" was dropped from the name of the REGENT BEVERLY WILSHIRE, in violation of Section 26.01(b) of the 1998 AMENDMENT; and

200152234 v3

      (iv)      Failing to use "all reasonable efforts consistent with a luxury-class hotel to maximize the patronage and profitability of" the HOTEL, pursuant to Section 5.02(b) of the AMENDED HMA.

178.   ACC has been damaged as a result of Defendant's breaches in an amount in excess of $75,000, the exact amount to be proven at trial.

179.   Unless the Defendant is permanently enjoined from committing future breaches of the Amended HMA, ACC will continue to suffer damages in the future. Such continuances and repeated harm is irreparable.

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (BWH LTD and BWH LLC v. Defendant)

180.   BWH reasserts and incorporates herein by reference the allegations contained in Paragraphs 1 through 179.

181.   From 1987 to the present, Defendant has been BWH's agent charged with managing and operating the HOTEL on behalf of BWH, which is BWH's principal asset.

182.   From 1987 to present, Defendant has had exclusive control of the day-to-day operation of the HOTEL, including but not limited to the receipt of the HOTEL's revenue.

183.   As its agent for the management and operation of the HOTEL, Defendant has been placed in a position of trust and, as such, owes BWH fiduciary duties, including the duties of care and loyalty.

184.   Defendant has breached its fiduciary duties to BWH by, among other things:

      (i)      Wrongfully competing with and against BWH by among other things providing FOUR SEASONS OPERATIONAL

BENEFITS to the REGENT BEVERLY WILSHIRE in violation of Defendant's fiduciary duties;

(ii) Creating confusion in the Beverly Hills/West Los Angeles Market by improperly marketing two "Four Seasons" hotels with the consequence of causing confusion amongst patrons and potential customers of the HOTEL, all in violation of Defendant's fiduciary duties;

(iii) Failing to implement the provisions of the 1998 AMENDMENT;

(iv) Upon information and belief, there are elements in the Defendant's hotel management agreement with the owner of the REGENT BEVERLY WILSHIRE that are materially inconsistent with the representations and warranties regarding Defendant's and REGENT INTERNATIONAL's compliance with the 1998 AMENDMENT which creates an undisclosed conflict of interest in violation of Defendant's fiduciary duties.

(v) Using the FOUR SEASONS OPERATIONAL BENEFITS within the restricted radius which drove business away from the HOTEL to the REGENT BEVERLY WILSHIRE, including but not limited to the improper use of the Four Seasons central reservation system;

(vi) Failing to disclose to BWH information material to the parties agency relationship;

(vii) Misrepresenting to BWH that Defendant's management and operation of the REGENT BEVERLY WILSHIRE would not harm BWH;

COMPLAINT
[Demand For Jury Trial]

200152234 v3

(viii)     Improperly benefiting the REGENT BEVERLY WILSHIRE, a direct competitor of the HOTEL; and

(ix)      Failing to use "all reasonable efforts consistent with a luxury-class hotel to maximize the patronage and profitability of" the HOTEL, pursuant to Section 5.02(b) of the AMENDED HMA.

185.    BWH has been damaged as a result of Defendant's breach of fiduciary duties in an amount in excess of $75,000, the exact amount to be proven at trial.

186.    Defendant's breaches were willful, malicious, and reprehensible in light of Defendant's position of trust and were undertaken with a conscious disregard for BWH's rights.  BWH is entitled to an award of punitive damages that is sufficient to punish Defendant and to deter it from engaging in similar misconduct in the future.

187.    Unless Defendant is permanently enjoined from committing future breaches of its fiduciary duties, BWH will continue to suffer damages in the future. Such continuances and repeated harm is irreparable.

## FIFTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Business Advantage)

### (BWH LTD and BWH LLC v. Defendant)

188.    BWH reasserts and incorporates herein by reference the allegations contained in Paragraphs 1 through 187 above.

189.    Through the goodwill of the HOTEL, BWH has a prospective business relationship with past customers that came to the HOTEL through the operating systems included in the FOUR SEASONS OPERATIONAL BENEFITS to book a room and schedule a meeting or event at a "Four Seasons" hotel in Los Angeles, which contains the probability that BWH will obtain a future economic benefit.

190.    Additionally, BWH has a prospective business relationship with new customers who are loyal to the Four Seasons brand of luxury hotels and stayed or had a

200152234 v3

meeting or group event at the REGENT BEVERLY WILSHIRE, when BWH had the contractual right to be the only Four Seasons branded hotel in that market. Such relationships include the probability that BWH will obtain future economic benefit.

191. Defendant knows of the existence of these relationships and prospective business advantages, as it acts as BWH's agent to book these rooms, events and meetings.

192. In breach of its contractual obligations to BWH, its fiduciary duties as BWH's agent, and California Bus. & Prof. Code § 17200, *et seq.*, Defendant has wrongfully interfered with these relationships and prospective business advantages by directing BWH's prospective customers to the REGENT BEVERLY WILSHIRE.

193. Defendant engaged in this conduct with the intent to interfere with the relationship between BWH and its prospective customers.

194. As a result of Defendant's conduct, BWH's relationship with its prospective customers was disrupted, as Defendant caused such prospective customers of BWH to book rooms, events and meetings at the REGENT BEVERLY WILSHIRE instead of at BWH's HOTEL.

195. BWH has been damaged by Defendant's interference in an amount in excess of $75,000, the exact amount to be proven at trial.

196. Defendant's interference was willful, malicious, reprehensible and undertaken with a conscious disregard for BWH's rights. BWH is entitled to an award of punitive damages that is sufficient to punish Defendant and to deter it from engaging in similar misconduct in the future.

## SIXTH CLAIM FOR RELIEF

### (Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200, et seq.)

197. Plaintiffs reassert and incorporate herein by reference the allegations contained in Paragraphs 1 through 196 above.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

198.   Unfair Business Practices Act, Cal. Bus. & Prof. Code §17200, *et seq.* is California's unfair competition law ("UCL"), which prohibits acts of unfair competition including any "unlawful, unfair, or fraudulent business act or practice."

199.   Defendant has engaged in unfair, unlawful, and/or fraudulent business acts or practices, as described herein.

200.   As a direct and proximate result of Defendant's violation of the UCL, Plaintiffs have suffered injury in fact and actual damages.

201.   As a direct and proximate result of Defendant's violation of the UCL, Defendant has obtained money and caused money to be diverted to the REGENT BEVERLY WILSHIRE that should have been paid to and rightfully belongs to Plaintiffs, for which Defendant should be required to make restitution to Plaintiffs pursuant to Cal. Bus. & Prof. Code § 17203.

202.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek restitution and an order of this Court requiring Defendant to immediately cease such acts of unfair competition and enjoining Defendants from continuing to conduct business via the unlawful, fraudulent, or unfair business acts and practices complained of herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, as follows:

1.   On the First Claim for Relief, BWH seeks: (a) an award of damages as a result of past losses it has incurred as a result of Defendant's breaches of the AMENDED HMA, the exact amount to be proven at trial and (b) pursuant to Section 26.01 (d) of the AMENDED HMA, a permanent injunction enjoining Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS, including but not limited to the Four Seasons central reservation system, at the REGENT BEVERLY WILSHIRE HOTEL in violation the terms of Section 26.01 of the AMENDED HMA.

COMPLAINT
[Demand For Jury Trial]

200152234 v3

2.      On the Second Claim for Relief, BWH seeks:  (a) an award of damages in an amount according to proof and (b) a permanent injunction enjoining Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE HOTEL in violation the terms of Section 26.01 of the AMENDED HMA.

3.      On the Third Claim for Relief, ACC seeks:  (a) an award of damages in an amount according to proof and (b) a permanent injunction enjoining Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE HOTEL in violation the terms of Section 26.01 of the AMENDED HMA.

4.      On the Fourth Claim for Relief, BWH seeks:  (a) an award of damages in an amount according to proof; (b) a disgorgement of profits obtained by Defendant through its breach of fiduciary duty; (c) a permanent injunction enjoining Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE HOTEL in violation the terms of Section 26.01 of the AMENDED HMA; and (d) an award of punitive damages in an amount according to proof.

5.      On the Fifth Claim for Relief, BWH seeks:  (a) an award of damages in an amount according to proof; (b) a permanent injunction enjoining Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE HOTEL in violation the terms of Section 26.01 of the AMENDED HMA; and (c) an award of punitive damages in an amount according to proof.

6.      On the Sixth Claim for Relief, Plaintiffs seek:  (a) restitution and (b) a permanent injunction enjoining Defendant from using the FOUR SEASONS OPERATIONAL BENEFITS at the REGENT BEVERLY WILSHIRE HOTEL in violation the terms of Section 26.01 of the AMENDED HMA.

7.      For interest on the judgment at the legal rate;

8.      For reasonable attorneys' fees and cost of suit, pursuant to Section 26.15 of the AMENDED HMA; and

41

200152234 v3

9.     For such other and further relief as the Court deems just and proper.

Dated:  January 11, 2011       **AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _____

David C. Allen
Attorneys for Plaintiffs

COMPLAINT
[Demand For Jury Trial]

200152234 v3

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues herein, except for the requests for a permanent injunction in ¶¶ 1(b), 2(b), 3(b), 4(c), 5(b) and 6(b) of the Prayer For Relief, supra.

Dated:  January 11, 2011          **AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _____

David C. Allen
Attorneys for Plaintiffs

COMPLAINT
[Demand For Jury Trial]

200152234 v3

**EXHIBIT A**

### AMENDED AND RESTATED
### HOTEL MANAGEMENT AGREEMENT


### B E T W E E N


### FOUR SEASONS HOTELS LIMITED


### AND


### BURTON WAY HOTELS, LTD.,
### a California Limited partnership

# TABLE OF CONTENTS

Page

ARTICLE I   DEFINITIONS . . . . . . . . . . . .   2

1.01  Principal Defined Terms . . . . . . . .   2

ARTICLE II   CONSTRUCTION AND PRE-OPENING PERIOD . . . . . .   13

2.01  Deficiencies . . . . . . . . . . . .   13
2.02  Repayment and Discharge of Pre-
      Opening Loan . . . . . . . . . . . .   13

ARTICLE III   TITLE, QUIET ENJOYMENT, OWNER'S RESERVATION . .   13

3.01  Title to Hotel . . . . . . . . . .   13
3.02  Quiet Enjoyment . . . . . . . . . .   14
3.03  Owner's Retail Facility . . . . . . .   14

ARTICLE IV   GUARANTY LETTER OF CREDIT AND ADDITIONAL CLOSING
             TRANSACTIONS . . . . . . . . . .   15

4.01  Guaranty Letter of Credit . . . . . . .   15
4.02  Loan to Cohens . . . . . . . . . . .   21

ARTICLE V   OPERATION OF THE HOTEL . . . . . . . .   24

5.01  Operator's Exclusive Management
      Responsibility . . . . . . . . . .   24
5.02  Duties and Powers of Operator . . . . . .   24
5.03  Limitations on Powers of Operator . . . .   27
5.04  Centralized Purchasing . . . . . . . .   28
5.05  Parking . . . . . . . . . . . . .   29
5.06  Additional Benefits to Employees . . . .   29
5.07  Capital Refurbishing and
      Improvements Programs . . . . . . . .   32
5.08  Owner's Suites. . . . . . . . . . .   32
5.09  Meetings with Operator's President . . .   34

ARTICLE VI   ANNUAL PLAN . . . . . . . . . . . . .   34

6.01  Annual Plan . . . . . . . . . . . .   34
6.02  Compliance with Annual Plan . . . . . .   36
6.03  Emergency Expenditures. . . . . . . .   36
6.04  Owner's Obligations to Fund Capital for
      Furniture, Fixtures & Equipment
      Replacements . . . . . . . . . . .   36

ARTICLE VII   OPERATOR TO ACT SOLELY AS AGENT FOR OWNER . . .   37

7.01  General. . . . . . . . . . . . . .   37
7.02  Delegation of Authority by Operator. . . .   37
7.03  General Manager. . . . . . . . . . .   38

i                          BURTON#9/AGMT.24/3mrt

ARTICLE VIII    FUNDING, BANKING AND CREDIT . . . . . . . . . .    38

    8.01 Repayment and Discharge of Operating
         Deficit Loans. . . . . . . . . . . . . . . .    38
    8.02 Funding of Operating Deficits. . . . . . .    38
    8.03 Operator's Discretionary Advances. . . . .    40
    8.04 Owner's Funding Account. . . . . . . . . .    40
    8.05 Bank Accounts  . . . . . . . . . . . . . .    42
    8.06 Owner's Right to Funds . . . . . . . . . .    43
    8.07 Pledging of Bank Accounts  . . . . . . . .    43
    8.08 Pledging Credit  . . . . . . . . . . . . .    43

ARTICLE IX      TERM AND EXTENSIONS . . . . . . . . . . . . . .    43

    9.01 Operating Term . . . . . . . . . . . . . .    43
    9.02 Extension Term . . . . . . . . . . . . . .    43

ARTICLE X       REMUNERATION AND REIMBURSEMENT OF OPERATOR  . .    45

    10.01 Refurbishing Fee  . . . . . . . . . . . .    45
    10.02 Centralized Service Charges . . . . . . .    45
    10.03 Adjustment of Service Charges . . . . . .    46
    10.04 Reimbursement of Costs  . . . . . . . . .    48
    10.05 Basic Fee . . . . . . . . . . . . . . . .    49
    10.06 Incentive Fee . . . . . . . . . . . . . .    50
    10.07 Net Operating Profit  . . . . . . . . . .    51
    10.08 Payments from Hotel Bank Accounts . . . .    52
    10.09 Timing of Payments  . . . . . : . . . . .    53
    10.10 Financial Statements of Hotel . . . . . .    55

ARTICLE XI      BOOKS AND RECORDS . . . . . . . . . . . . . . .    55

    11.01 General . . . . . . . . . . . . . . . . .    55
    11.02 Location, Examination and Inspection . . .    56
    11.03 Owner to Receive All Books and
          Records Upon Termination. . . . . . . . .    56

ARTICLE XII     REPAIRS, REPLACEMENTS, MAINTENANCE AND CAPITAL
                IMPROVEMENTS  . . . . . . . . . . . . . . . . .    57

    12.01 Repairs and Maintenance . . . . . . . . .    57
    12.02 Structural and
          Extraordinary Repairs . . . . . . . . . .    57

ARTICLE XIII    DAMAGE TO AND DESTRUCTION OF THE HOTEL  . . . .    58

    13.01 Owner's Obligation to Repair  . . . . . .    58
    13.02 Substantial or Uninsured Loss . . . . . .    58
    13.03 Operator's Reinstatement  . . . . . . . .    59

ARTICLE XIV      INSURANCE . . . . . . . . . . . . . . . . . . .      59

                 14.01 Coverage  . . . . . . . . . . . . . . .      59
                 14.02 Named Insureds . . . . . . . . . . . .      59
                 14.03 Policies  . . . . . . . . . . . . . . .      59
                 14.04 Insurance Companies . . . . . . . . . .      62
                 14.05 Certificate of Insurance  . . . . . . .      62
                 14.06 Blanket Policies . . . . . . . . . . . .      62
                 14.07 Insurance by Others . . . . . . . . . .      62

ARTICLE XV       REAL AND PERSONAL PROPERTY TAXES AND MORTGAGES      63

                 15.01 Payment of Taxes  . . . . . . . . . . .      63
                 15.02 Contest . . . . . . . . . . . . . . . .      63
                 15.03 Mortgages . . . . . . . . . . . . . . .      63

ARTICLE XVI      USE OF OPERATOR'S TRADE NAMES . . . . . . . . .      64

                 16.01 Name of Hotel; Written Matter Concerning
                       the Hotel. . . . . . . . . . . . . . . .      64
                 16.02 Use of Trade Names following
                       Termination . . . . . . . . . . . . . .      64
                 16.03 Operator May Seek Judicial Relief . . . .      65

ARTICLE XVII     CONDEMNATION  . . . . . . . . . . . . . . . . .      65

                 17.01 General; Complete Condemnation . . . . .      65
                 17.02 Partial Condemnation  . . . . . . . . . .      65
                 17.03 Temporary Condemnation  . . . . . . . . .      66

ARTICLE XVIII    ASSIGNMENT BY OWNER . . . . . . . . . . . . . .      66

                 18.01 Owner's Right to Assign . . . . . . . . .      66
                 18.02 Owner's Right to Mortgage . . . . . . . .      67
                 18.03 Limitation on Owner's Rights  . . . . . .      67
                 18.04 [Intentionally Omitted] . . . . . . . . .      69
                 18.05 Ground Lessor's Non-Disturbance
                       Agreement . . . . . . . . . . . . . . . .      69

ARTICLE XIX      EVENTS OF DEFAULT AND TERMINATION . . . . . . .      70

                 19.01 General . . . . . . . . . . . . . . . . .      70
                 19.02 Rights of Non-Defaulting Party  . . . . .      71
                 19.03 Remedying Defaults  . . . . . . . . . . .      71
                 19.04 Bona Fide Dispute . . . . . . . . . . . .      71
                 19.05 Owner's Rights to Terminate . . . . . . .      72

ARTICLE XX       ASSIGNMENT BY OPERATOR  . . . . . . . . . . . .      74

                 20.01 Permitted Assigns . . . . . . . . . . . .      74

ARTICLE XXI    OPERATOR'S LIABILITY . . . . . . . . . . .    75

      21.01 General; Standard of Care . . . . . . . .    75
      21.02 Accounting . . . . . . . . . . . . . . .    75
      21.03 Indemnity . . . . . . . . . . . . . . . .    76


ARTICLE XXII   ARBITRATION . . . . . . . . . . . . . . . .    76

      22.01 Manner; Allocation of Cost . . . . . . .    76

ARTICLE XXIII  CONSENT . . . . . . . . . . . . . . . . . .    77

      23.01 When Consent May Be Withheld . . . . . .    77

ARTICLE XXIV   OWNER HAS NOT RELIED ON REPRESENTATION . . . .    77

      24.01 Owner's Understanding . . . . . . . . . .    77
      24.02 Operator's Understanding . . . . . . . .    78

ARTICLE XXV    NOTICES . . . . . . . . . . . . . . . . . .    78

      25.01 Manner; Addresses . . . . . . . . . . .    78

ARTICLE XXVI   MISCELLANEOUS . . . . . . . . . . . . . . .    79

      26.01 Freedom of Action; Radius Restrictions .    79
      26.02 Headings . . . . . . . . . . . . . . . .    79
      26.03 Waivers . . . . . . . . . . . . . . . . .    79
      26.04 Limitation on Interest . . . . . . . . .    79
      26.05 Applicable Law . . . . . . . . . . . . .    80
      26.06 Entire Agreement . . . . . . . . . . . .    80
      26.07 Counterparts . . . . . . . . . . . . . .    81
      26.08 Time of Essence . . . . . . . . . . . . .    81
      26.09 Estoppel Certificates . . . . . . . . . .    81
      26.10 Currency . . . . . . . . . . . . . . . .    81
      26.11 Partial Invalidity . . . . . . . . . . .    81
      26.12 Transitional Provisions. . . . . . . . .    82
      26.13 Operator Not Third Party
            Beneficiary to Amended Partnership
            Agreement. . . . . . . . . . . . . . .    82
      26.14 Third Party Beneficiaries. . . . . . . .    82
      26.15 Attorneys' Fees. . . . . . . . . . . . .    83
      26.16 Interpretation. . . . . . . . . . . . .    83
      26.17 Payment of Legal Fees and
            Out-of-Pocket Expenses. . . . . . . . .    83
      26.18 Binding Effect. . . . . . . . . . . . . .    83

EXHIBITS

2.01    Deficiencies
4.01    Form of Guaranty LC
5.08    Owner's Suite Leases
14.01   Insurance Schedule

AMENDED AND RESTATED
HOTEL MANAGEMENT AGREEMENT

THIS AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT (the "Agreement") is made and entered into as of the __31st__ day of October, 1989, by and between FOUR SEASONS HOTELS LIMITED, a corporation incorporated under the laws of the Province of Ontario, Canada ("Operator"), and BURTON WAY HOTELS, LTD., a California Limited Partnership ("Owner"). This Agreement is made with respect to the following facts:

A.   Owner is the owner of improvements consisting of a luxury hotel, and the holder of a leasehold interest in the land upon which such Hotel is situated (such improvements and leasehold interest being referred to herein as the "Hotel"), consisting of approximately 2.02 acres of land, generally bounded by Burton Way, Doheny Drive, Third Street and Wetherly Drive in Los Angeles, California (the "Land").

B.   As of November 5, 1985, Owner and Operator entered into a Hotel Management Agreement (the "Original Agreement") pursuant to which, among other things, Operator agreed to operate, manage and supervise the Hotel in consideration for certain fees and other rights granted by Owner to Operator under the Original Agreement. The Original Agreement was amended by a First Amendment of Hotel Management Agreement, entered into as of November 15, 1985 (the "First Amendment"). All references herein to the "Original Agreement" shall include the First Amendment.



D.   In order to facilitate the Recapitalization and Refinancing, which transactions are anticipated to confer benefits upon Operator as well as Owner, Owner and Operator desire to modify, further amend and restate, as of the "Closing Date" (as defined herein), the Original Agreement in accordance with and subject to the following express terms and conditions.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, the parties hereto hereby agree that, subject to the provisions of paragraph 26.12 hereof and except as otherwise expressly provided herein, the Original Agreement is superseded in its entirety and shall not govern the rights, obligations and duties of the parties hereto for the period after the Closing Date (as defined herein) and, subject

1

BURTON#9/AGMT.24/3mrt

to the provisions of paragraph 26.12 hereof and except as otherwise expressly provided herein, the Original Agreement shall be replaced with this Agreement, which shall govern the rights, obligations and duties of the parties for the period after the Closing Date.  The parties hereto further agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.01  <u>Principal Defined Terms</u>.

Except as may otherwise be indicated by the context, the terms set forth below shall have the following meanings:

(a)  "Achieved Room Revenue of the Hotel" shall be as defined in paragraph 19.05(c) hereof.

(b)  "Achieved Room Revenue of the Test Hotel" shall be as defined in paragraph 19.05(c) hereof.

(c)  "Affiliate" shall mean any entity which controls, is controlled by or is under common control with Operator or Owner as the context may require, with "control" referring to ownership of 51% or more of the votes held by owners of shares or interests in an entity whose stock is not publicly traded or sold, or otherwise effective control, whether direct or indirect.

(d)  "Annual Plan" shall mean in respect of any Fiscal Year the annual operating plan and budget for the Hotel for such Fiscal Year prepared by Operator in accordance with Article VI hereof.

(e)  "Available Cash Flow" shall be as defined in paragraph 10.06(a) hereof.

(f)  "Basic Fee" shall be as defined in paragraph 10.05 hereof.

(g)  "Capital Loans" shall be as defined in paragraph 4.02(a) hereof.

(h)  "Capital Refurbishing Programs" shall be as defined in paragraph 5.07 hereof.

(i)  "Capital Reserve" shall be as defined in paragraph 6.04 hereof.

(j)  "Centralized Purchasing" shall be as defined in paragraph 5.04 hereof.

2

(k)  "Centralized Reservation Service Charge" shall be as defined in paragraph 10.02 hereof.

(l)  "Closing Date" shall be the date of recordation in the Official Records of Los Angeles County, California, of the Amended and Restated Memorandum of Hotel Management Agreement by and between Owner and Operator.

(m)  "Cohen Loans" shall be as defined in paragraph 4.02(a) hereof.

(n)  "Cohens" shall be as defined in paragraph 4.02(a) hereof.

(o)  "Corporate Advertising Charge" shall be as defined in paragraph 10.02 hereof.

(p)  "Corporate Sales and Marketing Charge" shall be as defined in paragraph 10.02 hereof.

(q)



3



4                    **BURTON#9/AGMT.24/3mrt**



BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt



(s)  "Fee Interest" shall mean Ground Lessor's interest
     in the Land subject to the Ground Lease.

(t)  "Fee Reduction Start Date" shall be as defined in
     paragraph 10.05(b) hereof.

(u)  "Fee Reduction Period" shall be as defined in
     paragraph 10.05(b) hereof.

(v)  "Fiscal Year" as used herein shall coincide with and
     be identical to the calendar year for all purposes,
     except that the first Fiscal Year shall be the
     period between the Opening Date and ending on
     December 31 of the same year and the last Fiscal
     Year shall be the period between January 1 and the
     date of the expiration or sooner termination of this
     Agreement.  Notwithstanding anything to the contrary
     herein, "Fiscal Year" shall not refer to any period
     after the expiration or sooner termination of this
     Agreement.

(w)  "Foreclosure" shall mean the acquisition or transfer
     of the Hotel or any portion thereof (including the
     Leasehold Estate but expressly excluding the Fee
     Interest), to any Mortgagee resulting from a
     foreclosure (whether judicial or non-judicial), deed
     in lieu of foreclosure, or negotiated work-out or
     settlement following any monetary default under any
     Mortgage whereby the Mortgagee acquires a
     substantial interest in the Hotel.

(x)  "Furniture, Fixtures and Equipment" shall mean all
     furniture, furnishings, fixtures and equipment
     required for the operation of a luxury-class hotel,
     including, without limitation, lobby furniture,
     carpeting, draperies, paintings, bedspreads,
     television sets, office furniture and equipment such
     as safes, registers, and accounting, duplicating and
     communication equipment, telephone systems, guest
     room furniture, specialized hotel equipment such as

equipment required for the operation of kitchens, laundries, the front desk, dry cleaning facilities, bars and cocktail lounges and decorative lighting, material handling equipment and cleaning and engineering equipment and all other fixtures, equipment, apparatus and personal property needed for such purposes. Furniture, Fixtures and Equipment shall exclude, however, (i) Hotel building equipment and systems (including, but not limited to, the heating, ventilating and air conditioning system, elevators, the electrical distribution system, life safety systems and plumbing), (ii) other fixtures attached to and forming part of the Hotel building (including, but not limited to, lighting fixtures and bars) installed during construction of the Hotel (but replacements thereof shall be included in Furniture, Fixtures and Equipment for purposes of this Agreement) and (iii) Operating Equipment and Supplies.

(y) "FRP Window Period" shall be as defined in paragraph 10.05(b) herein.



8       BURTON#9/AGMT.24/3mrt



(aa) "Ground Lease" shall mean that certain Ground Lease dated as of November 5, 1985, as amended by that certain First Amendment to Ground Lease, dated on or about the Closing Date, by and between ACC Company, a California general partnership as the "Lessor," and Owner, as the "Lessee," pursuant to which Owner has acquired the Leasehold Estate.

(bb) "Ground Lessor" or "Lessor" shall mean ACC Company, a California general partnership, the ground lessor under the Ground Lease, or any successor thereto.

(cc) "Ground Rent" shall mean all of the rental (including amounts which are currently earned but payment of which is deferred, including without limitation any "Deferred Rent" as defined in the First Amendment to Ground Lease) which is earned under the Ground Lease with respect to each Fiscal Year.  In the event of termination of the Ground Lease and the succession of the Lessor to Owner's position pursuant to Section 18.05 or otherwise, references herein to Ground Rent shall continue to apply as if the Ground Lease had not been terminated and the payments provided by 10.08(d) shall continue to be made to Owner (i.e., the Ground Lessor as successor to Owner) and treated as "Ground Rent" for purposes of the calculations in this Agreement.

(dd) "Guaranty LC" shall be as defined in paragraph 4.01(b) herein.

(ee) "Hotel" means the improvements consisting of a luxury class hotel which has been constructed as of the date hereof by Owner on the Leasehold Estate, and the hotel business being conducted therein; provided however such terms shall be deemed to expressly exclude (i) the Fee Interest, or any part thereof, and (ii) the sublessees' interest under the

9                    BURTON#9/AGMT.24/3mrt

Owner's Suite Leases, as more particularly described in paragraph 5.08 herein, but shall expressly include the Leasehold Estate, and any part thereof.

(ff) "Hotel Bank Accounts" shall be as defined in paragraph 8.05 hereof.



(ii) "Leasehold Estate" shall mean Owner's leasehold interest in the Land pursuant to the Ground Lease, but shall expressly exclude the sublessees' interest under the Owner's Suite Leases, as more particularly described in paragraph 5.08 herein and in such Owner's Suite Leases.

(jj) 

(kk) "Mortgage" shall mean a deed or deeds of trust and related instruments encumbering all or any part of Owner's Leasehold Estate (and the Hotel thereon) or the Fee Interest, but only with respect to the Fee Interest after the expiration or termination of the Ground Lease.

(ll) "Mortgagee" shall mean the holder of a Mortgage from time to time.

(mm) "Net Draw Downs" shall be as defined in paragraph 4.01(b) hereof.

(nn) "Net Operating Profit" shall be as defined in paragraph 10.07 hereof.

(oo) "Normal Fee Resume Date" shall be as defined in paragraph 10.05(b) hereof.

(pp) "Normal Fee Period" shall be as defined in paragraph 10.05(b) hereof.

(qq) "ODL Account" shall be as defined in paragraph 8.01(a) of the Original Agreement.

(rr) "Opening Date" shall mean the date on which the Hotel was first opened to the public for business for guest room occupancy which date was April 17, 1987.

(ss) "Operating Deficits" shall mean the amount by which cash in the Hotel Bank Accounts is insufficient to make the payments described in subparagraphs 10.08(a) through and including 10.08(l) of this Agreement.

(tt) "Operating Deficit Loans" shall be as defined in paragraph 8.01(a) of the Original Agreement.

(uu) "Operating Equipment and Supplies" shall mean all chinaware, glassware, linens, silverware, tools, kitchen utensils, uniforms, engineering and housekeeping tools and utensils, food and beverage items, fuel, soap, light bulbs, mechanical stores, cleaning supplies and materials, matches, stationery, paper supplies, laundry supplies, food service preparation utensils, housekeeping supplies, accounting supplies and other immediately consumable items used in the operation of a first class hotel.

(vv) "Operating Expenses" shall be as defined in paragraph 10.07(a) hereof.

(ww) "Operating Term" shall mean the term of this Agreement as provided in paragraph 9.01 hereof.

(xx) 

11                    BURTON#9/AGMT.24/3mrt



(yy) "Original Deed of Trust" shall refer to the Deed of Trust as defined in the Original Agreement.

(zz) "Partnership Agreement" shall be as defined in paragraph 4.01(a) hereof.

(aaa) "Plans" shall mean the plans, specifications and working drawings for the Hotel, approved by Owner and Operator to the extent required by the Pre-Opening and Technical Services Agreement.

(bbb) "Pre-Opening Loan" shall be as defined in paragraph 2.04(a) of the Original Agreement.

(ccc) "Pre-Opening and Technical Services Agreement" means the Agreement so entitled dated November 5, 1985, between Owner and Operator providing for the development, construction and equipping of the Hotel and preparation for the opening of the Hotel.

12                    BURTON#9/AGMT.24/3mrt

(ddd) "Refinance Mortgage" shall be as defined in paragraph 4.01(e) hereof.

(eee) "Refurbishing Fee" shall be as defined in paragraph 10.01 hereof.

(fff) "Test Hotel(s)" shall be as defined in paragraph 19.05(c) hereof.

(ggg) "Uniform System of Accounts" shall mean the Uniform System of Accounts for Hotels (the most recently published edition) of the Hotel Association of New York City, Inc., as adopted by the American Hotel Association of the United States and Canada.

(hhh) "Working Capital Line" shall be as defined in paragraph 8.04 hereof.

## ARTICLE II
## CONSTRUCTION AND PRE-OPENING PERIOD

2.01 <u>Deficiencies</u>.

Operator acknowledges that as of the date hereof there are no deficiencies for construction work remaining uncorrected as of the Opening Date (including "punchlist" items), except as set forth on Exhibit 2.01 attached hereto.

2.02 <u>Repayment and Discharge of Pre-Opening Loan</u>.

Operator acknowledges and agrees that concurrently herewith all obligations of Owner to Operator with respect to the Pre-Opening Loan (including obligations to repay principal and to pay current or deferred interest on principal and current or deferred interest on deferred interest) have been repaid and/or forgiven and are completely and forever discharged. Operator shall execute from time to time any and all instruments reasonably requested by Owner to indicate that all such obligations were cancelled and forever forgiven.

## ARTICLE III
## TITLE, QUIET ENJOYMENT, OWNER'S RESERVATION

3.01 <u>Title to Hotel</u>.

Subject to the provisions of this Agreement with respect to permitted transfers, assignments and encumbrances by Owner, Owner warrants that it has acquired, and throughout the Operating Term will maintain the Hotel, free and clear of any liens, encumbrances, covenants, charges, burdens or claims, except (i) matters which will not materially and adversely affect the operation of the Hotel by Operator, (ii) subject to Paragraph 18.02

13                          BURTON#9/AGMT.24/3mrt

hereof, encumbrances contemplated by this Agreement and any refinancing or replacements of such financing (including the Refinancing, the LC Loan, or any other financing now or in the future desired by Owner and to be secured by the Hotel or any replacement or refinancing of any of the foregoing), and (iii) other matters approved by Operator which approval will not be unreasonably withheld.

3.02  **Quiet Enjoyment**.

Owner warrants that Operator, on fulfilling its obligations hereunder, shall and may peaceably and quietly possess, manage and operate the Hotel during the Operating Term, free from interruption or disturbance, except as contemplated by this Agreement or caused by Operator.

3.03  **Owner's Retail Facility**.

Notwithstanding anything in this Agreement to the contrary, Owner has reserved the right throughout the Operating Term to operate, or from time to time grant a concession to one or more Affiliates or non-Affiliates ("Concessionaire") for the operation of a retail flower shop facility throughout the Operating Term in that portion of the Hotel where it is situated as of the date hereof.  Such facility shall not be deemed a portion of the Hotel for the purposes of this Agreement.  The costs of the construction, operation and maintenance of the facility shall be borne solely by Owner or Concessionaire.  To the extent feasible, all utility and other services to the facility shall be arranged, metered and charged separately from the Hotel.  Any and all costs to the Hotel of providing utility or other services to the facility, however, shall be paid by Owner or Concessionaire to Operator for the account of the Hotel on a monthly invoice basis. Income generated by such facility shall not be included in Hotel Gross Receipts. Operator shall have no obligations with respect to the operation, use, maintenance or repair of the facility.  Owner or Concessionaire shall at all times operate and maintain the facility in a first-class fashion befitting a facility constituting a part of a first-class luxury hotel project.  Operator has approved the plans for such facility and shall have the right to approve all subsequent material exterior alterations, which consent shall not be unreasonably withheld.  Operator approves of the use of such facility for the operation of a flower shop.  No other use (i) competitive with a retail facility within the Hotel, (ii) inconsistent, in terms of quality and character of merchandise, traffic and operations, with the facility's location in a luxury hotel project, (iii) of a non-retail character or (iv) not approved by Operator, which approval shall not be unreasonably withheld, shall be permitted.  Operator shall not permit the operation within the Hotel of a retail facility competitive with Owner's or Concessionaire's approved use.  If either Owner or Operator deems it appropriate, the parties shall enter into a further written agreement detailing and governing the relationship between the Hotel and Owner's or Concessionaire's retail facility.

### ARTICLE IV
### GUARANTY LETTER OF CREDIT AND
### ADDITIONAL CLOSING TRANSACTIONS

**4.01   Guaranty Letter of Credit.**





16

BURTON#9/AGMT.24/3mrt



17                    BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt



21                    BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt

## ARTICLE V
## OPERATION OF THE HOTEL

5.01  **Operator's Exclusive Management Responsibility.**

Owner hereby engages Operator as the exclusive operator of the Hotel during the Operating Term with exclusive responsibility and full control and discretion in the operation, direction, management and supervision of the Hotel and its staff, except as otherwise provided in this Agreement.

5.02  **Duties and Powers of Operator.**

Operator shall, throughout the Operating Term, in a professional, efficient and expeditious manner, do all things and take all necessary action for the operation of the Hotel, including all labor relations functions, all for the account of and on behalf of Owner.  Without limiting the generality of the foregoing and the other provisions of this Agreement, Operator is hereby authorized and directed to and shall:

(a)  supervise and direct the management and operation of the Hotel as a luxury-class hotel in a manner consistent with the operation as of the date of this Agreement of the Four Seasons' hotels in Washington, D.C., Philadelphia, Pennsylvania, London, England and Chicago, Illinois.  Operator shall maintain a standard of performance and services at the Hotel not lower than that maintained generally by the highest quality luxury hotels located in the area encompassed by paragraph 26.01 hereof, including without limitation the Beverly Hills Hotel, the L'Ermitage Hotel, the Beverly Wilshire Hotel, and the Tower addition of the Century Plaza Hotel. Operator's covenant to maintain the Hotel in accordance with the standard of performance and service set forth above shall be determined without reference to services requiring technological advances or other capital improvements not contained within the Hotel upon completion of construction, unless such equipment and services are provided to the Hotel by Owner thereafter.  In determining whether Operator has met the foregoing standard, ratings in generally recognized travel guides, such as the Mobil Travel Guide, will be given due consideration.

24                    BURTON#9/AGMT.24/3mrt

(b)  use all reasonable efforts consistent with a luxury-class hotel to maximize patronage and profitability of Hotel facilities;

(c)  apply for and take all necessary action to procure and renew in Owner's name all licenses and permits required for the operation of the Hotel, including liquor, restaurant and laundry licenses;

(d)  use all reasonable efforts to collect all charges, rents and other amounts due from guests, patrons, and Hotel tenants, subtenants, parties providing exclusive services and concessionaires; cause notices to be served upon such guests, patrons, tenants, subtenants, parties providing exclusive services and concessionaires to quit and surrender space occupied or used by them where desirable or necessary; ask for, demand, collect and give receipts for all charges, rents and other amounts which may at any time be due from any guest, patron, tenant, subtenant, party providing exclusive services or concessionaire; and sue for and institute summary proceedings where desirable or necessary in the name of Operator (or Owner where required) in connection therewith;

(e)  employ, pay, supervise and discharge all personnel of the Hotel, establish and from time to time modify appropriate employee benefit plans, pension plans and profit sharing plans applicable to the Hotel, and determine all matters with regard to such personnel, including without limitation, compensation, bonuses, fringe benefits and replacements, all in accordance with uniformly applied practices and procedures of Operator established for its operations in the United States. All such personnel shall be employees of Operator or Operator's Affiliate employed at Owner's sole cost and expense. Owner shall indemnify and hold Operator harmless from and against any and all costs and expenses incurred by Operator or such Affiliate in connection therewith which would not have been incurred by Operator or such Affiliate if such personnel had been employed by Owner and supervised by Operator in accordance with this Agreement (including, but not limited to, gross receipts taxes on payroll reimbursements, and increased California income taxes as a result of having such employees in the State); provided, however, that the foregoing indemnification shall not include or encompass (a) any penalty, interest or assessment levied on Operator or its Affiliates as a result of its or their failure to make proper withholdings from employee wages, except to the extent that such

failure is the result of Owner's failure to provide funds therefor as required by this Agreement or (b) any liability, cost or other expense against which Operator agreed to indemnify Owner, or with respect to which Operator shall remain liable (including without limitation the liability costs and other expenses described in clauses (i) through (v) of paragraph 21.03), pursuant to the express provisions of paragraphs 21.01 and 21.03.

(f) negotiate, in consultation with Owner, with any labor union or other bargaining unit lawfully entitled to represent the employees or some of them engaged in the operation of the Hotel;

(g) establish the Hotel's policy regarding association with any credit card system in conformity with Operator's uniformly applied general policy in such regard;

(h) subject to, and within the limits of, the Annual Plan, except as may otherwise be agreed to by Owner, purchase or provide for, or both, in the Fiscal Year to which such Annual Plan relates, the items provided and referred to in such Annual Plan;

(i) provide for the maintenance and repair of the Hotel in accordance with luxury hotel standards;

(j) make available its head office personnel for the purpose of reviewing all plans and specifications for alteration of the Hotel, advising with reference to the design of replacement Furniture, Fixtures and Equipment and the quantities required, and in general for the purpose of eliminating operational problems or improving operations;

(k) cause all such other things to be done in and about the Hotel as shall be necessary to comply with all statutes, ordinances, laws, rules, regulations, orders and requirements of any federal, provincial state or municipal government and appropriate departments, commissions, boards and offices thereof having jurisdiction in the matter respecting the use or manner of use of the Hotel or the maintenance and operation thereof, as well as with the orders and any requirements of any local board of fire underwriters or any other body which may exercise similar functions; provided, however, that either Operator or Owner shall have the right to contest by legal proceedings the validity of any such statute, ordinance, law, rule, regulation, order or requirements to the extent and in the manner provided or permitted by law until final determination of any such proceedings;

BURTON#9/AGMT.24/3mrt

(l)   arrange for utility, telephone, vermin
      extermination, detective agency protection,
      security, trash removal, elevator and escalator
      maintenance, window washing, and all other services
      necessary for the operation of the Hotel;

(m)   purchase on the credit of Owner all food,
      beverages, Operating Equipment and Supplies,
      Furniture, Fixtures and Equipment and such other
      services and merchandise as are necessary for proper
      operation of the Hotel and as provided in the
      approved Annual Plan;

(n)   arrange and coordinate the design and construction
      elements and the purchase of all Furniture, Fixtures
      and Equipment pursuant to any approved refurbishing
      plan or the Annual Plan;

(o)   furnish the corporate sales and marketing services,
      corporate and regional sales offices, corporate
      advertising services, public relations and
      centralized reservation services as provided in
      paragraph 10.02 hereof;

(p)   commence such legal actions or proceedings
      concerning the Hotel as are necessary or required in
      the opinion of Operator;

(q)   advise Owner of the commencement of any legal
      action or proceeding concerning the Hotel, and
      retain counsel reasonably acceptable to Owner in
      connection with any action or proceeding commenced
      by or against Operator concerning the Hotel; and

(r)   if in Operator's opinion it is desirable, grant
      concessions for services customarily subject to
      concession in hotels of a class and quality similar
      to the Hotel, including gift and sundries shops, but
      excluding food and beverage operations.

5.03   <u>Limitations on Powers of Operator</u>.

Notwithstanding the provisions of Paragraph 5.02 above,
Operator shall not take any of the following actions without the
prior written approval of Owner:

(a)   Enter into any leases, licenses, concession
      agreements or garage or retail contracts for a term
      in excess of two (2) consecutive years or where the
      aggregate consideration required to be paid to Owner
      is in excess of $50,000 (adjusted annually at the
      commencement of each Fiscal Year to reflect changes
      in the Consumer Price Index, as defined in paragraph
      6.01 below, measured from the index published

immediately prior to the date of the Original Agreement to the index published immediately prior to such Fiscal Year);

(b)   Enter into any collective bargaining agreements for the Hotel upon terms inconsistent with standards and parameters therefor previously approved by Owner;

(c)   Execute or enter into any contract or undertaking to borrow money on behalf of Owner unless specifically provided for herein;

(d)   Make, execute or deliver on behalf of Owner any assignment for the benefit of creditors, or any guaranty, indemnity bond or surety bond; or

(e)   Confess any judgment on behalf of Owner or the Hotel.

5.04   **Centralized Purchasing.**

Operator has adopted a centralized purchasing system whereby items of Operating Equipment and Supplies are purchased for participating hotels from suppliers designated by Operator or from or through any of Operator's Affiliates ("Centralized Purchasing"). Operator shall cause the Hotel to participate in such Centralized Purchasing and Operator or an Affiliate of Operator shall receive a fee for the negotiation of contracts for the direct purchase by Operator from independent suppliers of Operating Equipment and Supplies. Subject to the limitations on total cost set forth herein, the fee received by Operator shall be the same as that charged, from time to time, to all hotels managed by Operator for Centralized Purchasing services, ▓▓▓▓▓▓▓▓▓

Before acquiring any Operating Equipment and Supplies, Operator shall furnish to Owner a price list of such equipment and supplies proposed to be purchased by Operator through its Centralized Purchasing. Notwithstanding the foregoing, the cost to the Hotel of any purchase accomplished through Centralized Purchasing (including the aforementioned fee), taking into account the quality and payment terms of the items purchased, shall be no greater than the cost at which such services and items could be obtained by the Hotel from unaffiliated third parties (without payment of the aforementioned fee). If such maximum is determined to have been exceeded, the excess shall be rebated immediately by Operator into the Hotel Bank Accounts. All such purchases shall be made by Operator as agent for and at the sole risk of Owner. Operator makes no representation or warranty with respect to such services and items so purchased and shall not be responsible for defects in any property acquired, but shall enforce third party warranties regarding such services and items.

BURTON#9/AGMT.24/3mrt

5.05  <u>Parking</u>.

Owner acknowledges that the provision of parking
services to the Hotel is a critical aspect of the operations of the
Hotel and must be managed in an effective fashion, coordinated with
other Hotel operations.  Operator, therefore, shall have the right
to manage the parking and garage services itself or to retain a
specialized professional parking operator under a management
agreement or a lease, on terms and conditions satisfactory to
Operator and Owner. All parking shall be operated and maintained in
full compliance with law, including any requirement of the City of
Los Angeles to provide attendant parking.

5.06  <u>Additional Benefits to Employees</u>.



29                    BURTON#9/AGMT.24/3mrt



30                    BURTON#9/AGMT.24/3mrt



**BURTON#9/AGMT.24/3mrt**

### 5.07   Capital Refurbishing and Improvements Programs.

Operator may, at its discretion, submit to Owner from time to time details of proposed capital refurbishing and improvements programs (each a "Capital Refurbishing Program") for Owner's approval, which approval shall not be unreasonably withheld or delayed.  Upon approval by Owner, Operator shall implement any Capital Refurbishing Program.  Owner shall provide Operator with all funds required for any such Capital Refurbishing Program and shall release funds for such purposes on submission by Operator of invoices approved for payment by Operator.

### 5.08   Owner's Suites.



BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt

### 5.09  Meetings with Operator's President.

Operator acknowledges that Owner has a high regard for the managerial abilities and hotel experience of Mr. Isadore Sharp, President of Operator.  At any time the Hotel is incurring Operating Deficits (or would be incurring Operating Deficits but for the funding of such Operating Deficits by Owner) and if at such time Mr. Isadore Sharp is employed by Operator in any capacity or as a consultant, Operator shall cause Mr. Sharp to be made available to Owner without any additional cost for consultation with respect to management of the Hotel, including, if requested by Owner, meetings with Owner at the Hotel with reasonable frequency but not more often than once during each sixty (60) day period that the Hotel is incurring Operating Deficits (or would be incurring Operating deficits but for the funding of such Operating Deficits by Owner).

### ARTICLE VI
### ANNUAL PLAN

### 6.01  Annual Plan.

(a)  Operator shall submit to Owner, for its approval, not later than sixty (60) days prior to the Opening Date and thereafter at least thirty (30) days before the beginning of each Fiscal Year, an annual business plan for the Hotel (the "Annual Plan") substantially in the form utilized by Operator (copies of which have been provided to and approved by Owner).  The Annual Plan shall be reviewed and revised by Operator, and submitted to Owner, from time to time during each Fiscal Year to reflect material changes in the Annual Plan.  If no material change is required or warranted, Operator shall confirm that the Annual Plan remains valid and unchanged in each monthly report to Owner.  Owner shall notify Operator of its approval or disapproval of the Annual Plan not later than thirty (30) days after receipt thereof. If no such notice is given by Owner within such thirty (30) day period, then Owner shall be deemed to have approved of the Annual Plan as submitted by Operator.  If Owner disapproves of all or any portion of such Annual Plan within such thirty (30) day period, Owner shall furnish Operator at the time of notice of such disapproval with the reasons for its objections to the Annual Plan and Owner and Operator shall attempt to agree in respect of the items to which Owner objects within fifteen (15) days after notice of disapproval has been given, and if such agreement is not reached before such time then either of the parties may refer the matter to arbitration pursuant to the provisions of Article XXII hereof. Pending the arbitration decision, the approved Annual Plan for the Fiscal Year shall be deemed to be (i) as to items to which Owner has not objected, the Annual Plan submitted by Operator and (ii) as to items to which Owner has objected, the amount specified for such items in the preceding Fiscal Year's Annual Plan adjusted by the percentage change, if any, in the Consumer Price Index last published prior to the beginning of the new Fiscal Year as compared with the Consumer Price Index last published prior to the beginning of the immediately preceding Fiscal Year (or, if such item was

adjusted or added to the preceding Fiscal Year's Annual Plan following the beginning of such Fiscal Year, the date of such adjustment or addition). The "Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers for the Los Angeles - Anaheim - Riverside Area (Base: 1982-1984=100) as published by the Bureau of Labor Statistics, United States Department of Labor for such Fiscal Year. In the event that the Consumer Price Index ceases to use the 1982-1984 base of 100, or the Consumer Price Index shall be discontinued for any reason, the Bureau of Labor Statistics shall be requested to furnish a new index comparable to the Consumer Price Index together with information which will make possible the conversion to the new index in computing the adjusted amount in accordance with this paragraph. If for any reason the Bureau of Labor Statistics does not furnish such an index and such information, the parties hereto shall thereafter accept and use such other index, or comparable statistics on the cost of living for the consumer in the Los Angeles area, as shall be computed and published by an agency of the United States, or by a responsible financial periodical or recognized authority, then to be selected by the parties.

(b)   Each Annual Plan shall include the following information:

(i)   a marketing plan which provides general sales and marketing philosophy and strategy covering both local and national sales, advertising and promotional activities, market analysis, advance booking information, pricing strategy, customer relations, credit card policy, complimentary rooms policy, staffing plan and budget;

(ii) an annual forecast of operations, including projected occupancy rates and average daily room rates, estimated complimentary or discounted rooms, food, beverage and other sales, departmental expenses, general and administrative expenses, anticipated expenses for repairs, renovation and maintenance and capital improvements, expenses for utility services, taxes and insurance;

(iii) a projected balance sheet, cash flow budget, and sources and uses of cash statement;

(iv) a capital plan for expenditures on Furniture, Fixtures and Equipment and any other proposed capital improvements;

(v) a payroll and staffing plan;

(vi) current operating policies and procedures, or any revisions from same previously submitted; and

35                    BURTON#9/AGMT.24/3mrt

            (vii) a summary of all operating licenses, leases and contracts anticipated to be executed during the year.

6.02   <u>Compliance with Annual Plan</u>.

During each Fiscal Year, Operator, in the performance of its duties under this Agreement, shall comply with the Annual Plan relating to such year and shall not (except for emergency or unforeseen expenditures required by a violation of law or a change of law) materially deviate from any budget category set forth in the Annual Plan, incur any material additional expense or change materially the manner of operation of the Hotel, without the approval of Owner.  Owner acknowledges that, notwithstanding Operator's experience and expertise in relation to the operation of hotels, the projections contained in each Annual Plan are subject to and may be affected by changes in financial, economic and other conditions and circumstances beyond Operator's control.

6.03   <u>Emergency Expenditures</u>.

Whenever, by reason of circumstances beyond the control of Operator, emergency expenditures are in the opinion of Operator required to be made for the lawful or safe operation of the Hotel, Operator may make such expenditures, notwithstanding that such expenditures are not provided for in the Annual Plan.  Operator, in all events, shall take reasonable steps to secure Owner's prior consent and shall advise Owner as soon as possible of the nature of the emergency, the proposed remedy and the cost thereof.

6.04   <u>Owner's Obligation to Fund Capital for Furniture, Fixtures & Equipment Replacements</u>.



BURTON#9/AGMT.24/3mrt

## ARTICLE VII
## OPERATOR TO ACT SOLELY AS AGENT FOR OWNER

### 7.01  General.

In the performance of its duties as Operator of the Hotel, Operator shall act solely as agent of Owner.  Nothing herein shall constitute or be construed to be or create a partnership, joint venture, or joint employer relationship between Owner and Operator.  All debts and liabilities to third persons required or permitted to be incurred by Operator under this Agreement in the course of its operation and management of the Hotel on behalf of Owner, shall be the debts and liabilities of Owner only and Operator shall not be liable for any such obligations by reason of its management, supervision, direction and operation of the Hotel for Owner. Operator may so inform third parties with whom it deals on behalf of Owner and may take any other reasonable steps to carry out the intent of this paragraph.  Operator shall be responsible for all debts or liabilities to third parties incurred in violation of this Agreement or for its own account.

### 7.02  Delegation of Authority by Operator.

Every person engaged by Operator to perform services in connection with this Agreement, including any agent or employee of Operator or its Affiliates or any agent or employee of Owner hired by Operator, shall be acting as the agent of Owner.  To the extent that Operator deems such action to be advisable and in Owner's best interest, Operator may delegate to one or more persons in its general employ or to the general manager of the Hotel the responsibility of employing, paying, supervising and discharging employees. Each person to whom any such duty is delegated shall be the agent of Owner and not of Operator for such purposes. Nothing herein shall be construed to create a joint employee relationship, nor relieve Operator of its responsibilities under this Agreement. Operator's agency hereunder shall be exclusive, however, and neither Owner nor any officer or other employee of Owner shall have the right to supervise, direct the performance of, or discharge any Hotel employee; provided, however, that Operator shall promptly consider in good faith Owner's request that any employee be discharged for specified cause.  Except to the extent expressly provided herein, Operator shall not be liable to Owner or others for any act or omission on the part of Hotel employees.  Operator will, in the hiring of such employees, use reasonable care to select qualified, competent and trustworthy employees.  The assignment of duties of all such Hotel employees shall be the duty, and responsibility of Operator.  Owner shall, however, remain obligated to advance or reimburse Operator for all wages and other compensation payable with respect to Hotel employees (including, but not limited to, all compensation and benefits accrued to the expiration or sooner termination of this Agreement).

### 7.03  <u>General Manager</u>.

Operator understands and agrees that Owner is vitally interested in the qualifications and performance of the executive staff of the Hotel.  Accordingly, Operator will consult with Owner prior to making any appointment of a General Manager and any General Manager shall be experienced and fully qualified to supervise the operation of the Hotel in accordance with this Agreement.  If after any such appointment, Owner becomes dissatisfied with the performance of any General Manager, Owner shall have the right to confer with Operator, through the senior executives of Operator responsible for the operation of the Hotel, in an attempt to resolve any problems.  Operator shall reasonably consider such views of Owner, including consideration of replacing such individual, it being understood, however, that the final decision as to the appointment and continued employment of the General Manager shall be made by Operator.

<u>ARTICLE VIII</u>
<u>FUNDING, BANKING AND CREDIT</u>

### 8.01  <u>Repayment and Discharge of Operating Deficit Loans</u>.



### 8.02  <u>Funding of Operating Deficits</u>.

BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt

8.03   **Operator's Discretionary Advances.**

8.04   **Owner's Funding Account.**

BURTON#9/AGMT.24/3mrt



41                    BURTON#9/AGMT.24/3mrt



8.05 <u>Bank Accounts</u>.

Bank accounts established and maintained in connection with the operation of the Hotel ("Hotel Bank Accounts") shall at all times be at banks designated by Owner and maintained under the name of the Hotel. Operator shall designate those persons who may draw on such accounts. All persons authorized by Operator to draw on such accounts shall be covered by fidelity bonds in form, substance and amount reasonably acceptable to Owner. All monies derived from the operation of the Hotel only shall be deposited in the Hotel Bank Accounts and all disbursements in respect of the Hotel, to the extent provided in paragraph 10.08 herein, shall be made from the Hotel Bank Accounts. Notwithstanding anything to the contrary contained herein, neither the proceeds from any financing, refinancing, sale, condemnation or casualty (except to the extent such condemnation or casualty proceeds were included in Gross Receipts pursuant to paragraph 1.01(z)(iv)) of all or any part of the Hotel nor any funds drawn down from the Guaranty LC shall be deposited into the Hotel Bank Accounts and therefore no such proceeds or funds shall constitute funds available to pay the items set forth in paragraph 10.08. Operator shall make available to Owner from time to time when reasonably requested, all records of the Hotel Bank Accounts, and shall cooperate with Owner's reasonable cash management directions so that funds in such accounts shall, whenever practicable, be held in interest bearing accounts.

8.06  Owner's Right to Funds.

Funds in Hotel Bank Accounts shall be the property of Owner but shall be disbursed only in accordance with the provisions of this Agreement.  Notwithstanding the foregoing, Owner will bear all losses occasioned by the failure or insolvency of the bank or other financial institution in which any Hotel Bank Account is maintained.

8.07  Pledging of Bank Accounts.

Owner shall not pledge or deal with Hotel Bank Accounts in any manner which will impede the ability of Operator to pay obligations incurred in the operation of the Hotel.

8.08  Pledging Credit.

Except as otherwise expressly provided herein, including without limitation paragraphs 4.01 and 8.04, and except for any loans and advances Operator is required pursuant to the terms of this Agreement to provide, Operator shall not be required to pledge its own credit in the acquisition of Furniture, Fixtures and Equipment or Operating Equipment and Supplies or in connection with other Hotel operations.  Except as expressly provided for in this Agreement, if any credit is extended for Owner's account upon the reputation of Operator and the extension of the credit ultimately results in the liability of Operator to those creditors by reason of Owner's failure to reimburse Operator, then Owner shall indemnify Operator for any and all costs and expenses which Operator reasonably incurs, including lawyers' fees, in protecting its interests against those creditors by reason of the failure by Owner to so reimburse Operator.

### ARTICLE IX
### TERM AND EXTENSIONS

9.01  Operating Term.

The Operating Term of this Agreement shall be for a period commencing on the Opening Date and terminating at midnight on the last day of the fifty-fifth (55th) anniversary of the Opening Date, unless sooner terminated pursuant to the terms hereof.  The Operating Term shall be extended, however, by a period equal to the period between any termination and subsequent reinstatement of this Agreement pursuant to Article XIII or paragraph 19.05(a) below.

9.02  Extension Term.

If Operator is not in material default under this Agreement on the date of the expiration of the Operating Term, Operator shall have the following rights to extend the term of this Agreement beyond such expiration date:

(a)   Not less than two (2) nor more than three (3) years prior to the expiration of the Operating Term, Owner shall give Operator written notice expressing either (i) Owner's decision to offer the management of the Hotel to another nationally recognized hotel manager on specific terms set forth in the notice, (ii) Owner's election to have an identified Affiliate operate the Hotel following the expiration of the Operating Term, or (iii) Owner's desire to have Operator extend the term of this Agreement.

(b)   If Owner makes the election as described in clause (a)(i) above, Operator shall have the right, exercisable by written notice given to Owner within one-hundred eighty (180) days following receipt of Owner's written notice, to continue to manage the Hotel for an additional term equal to that proposed in Owner's notice for management by a third party manager, but not to exceed twenty (20) Fiscal Years, and otherwise on the terms and conditions set forth in the third party offer proposal.  If Operator does not elect to exercise such right, Owner shall be free to engage another nationally recognized hotel manager to manage the Hotel following the expiration of this Agreement on terms and conditions no less favorable to Owner than those set forth in Owner's notice to Operator.  If, however, Owner should fail to enter into a binding agreement for such engagement prior to the commencement of the final Fiscal Year of the term of this Agreement, and Owner does not prior to such date give Operator written notice of Owner's election to manage the Hotel itself or through an Affiliate, Operator shall have the right to renew the term, exercisable by written notice given to Owner within thirty (30) days following such date for a term of an additional twenty (20) Fiscal Years.

(c)   If Owner engages an Affiliate to manage the Hotel, as described in clause (a)(ii) above, Operator shall have no right to manage the Hotel following the expiration of the initial Operating Term.

(d)   If Owner desires that Operator continue to manage the Hotel, as described in clause (a)(iii) above, or if Owner fails to deliver timely and proper notice pursuant to subparagraph 9.02(a) within ten (10) days following notice from Operator, Operator shall have the option to renew the term of this Agreement, exercisable by written notice given to Owner, for a term of an additional twenty (20) Fiscal Years on all of the terms and conditions set forth in this Agreement, except that Operator shall have no further rights to extend the term of this Agreement.

BURTON#9/AGMT.24/3mrt

## ARTICLE X
### REMUNERATION AND REIMBURSEMENT OF OPERATOR

**10.01  Refurbishing Fee.**



**10.02  Centralized Service Charges.**



**10.03  Adjustment of Service Charges.**

BURTON#9/AGMT.24/3mrt



47                              BURTON#9/AGMT.24/3mrt



**10.04   <u>Reimbursement of Costs</u>.**

10.05   **Basic Fee**



BURTON#9/AGMT.24/3mrt



**10.06  <u>Incentive Fee</u>.**



BURTON#9/AGMT.24/3mrt

**10.07** <u>**Net Operating Profit.**</u>



BURTON#9/AGMT.24/3mrt



**10.08  <u>Payments from Hotel Bank Accounts</u>.**

**BURTON#9/AGMT.24/3mrt**

**10.09   Timing of Payments.**





BURTON#9/AGMT.24/3mrt



**10.10  Financial Statements of Hotel.**



**ARTICLE XI**
**BOOKS AND RECORDS**

**11.01  General.**

Operator shall, for the account of Owner, keep full and adequate books of account and other records on an accrual basis reflecting the results of operation of the Hotel, all in accordance with the Uniform System of Accounts and with generally accepted accounting principles, with such exceptions as may be required by

the provisions of this Agreement. Operator shall be permitted, however, to make such modifications in such accounts as are consistent with Operator's standard practice in accounting for its operations under management contracts generally.  Operator shall engage, at the expense of the Hotel, the accounting firm of Peat, Marwick & Mitchell or another independent and national firm of certified public accountants generally recognized as having significant experience in hotel accounting and auditing (such as Pannell Kerr Forster, or Laventhal and Horwath), designated by Operator and approved by Owner and Mortgagee, which approval shall not be unreasonably withheld, to provide accounting services to the Hotel.

### 11.02   Location, Examination and Inspection.

Except for the books and records which may be kept in Operator's home office or other suitable location pursuant to the adoption of a central billing system or other centralized service, the books of account and all other records relating to or reflecting the operation of the Hotel shall be kept at the Hotel. Duplicates or print-outs shall be maintained at the Hotel of all books and records kept at any location other than the Hotel.  All books and records shall be available to Owner and any Mortgagee, and their representatives, at all reasonable times for examination, inspection and transcription.  All such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records, at all times shall be the property of Owner, and those which are to be kept at the Hotel shall not be removed from the Hotel by Operator without Owner's prior approval and consent.  In the event that Owner or Mortgagee causes an audit of such books and records to be made, and if the statement of revenues and/or expenses shall be found to be more than 2% in error from that reported by Operator, Operator shall immediately pay to Owner or Mortgagee, as appropriate, the cost of such audit.  The cost of such audit otherwise shall be paid by Owner as an Operating Expense of the Hotel, provided that such cost shall not be treated as an Operating Expense in the calculation of Net Operating Profit or Available Cash Flow.

### 11.03   Owner to Receive All Books and Records Upon Termination.

Upon any termination of this Agreement, all books and records, including originals or copies, as appropriate, of all books and records not kept at the Hotel, shall be turned over to Owner forthwith so as to ensure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Operator at all reasonable times for inspection, audit, examination and transcription for a period of five (5) years.

## ARTICLE XII
## REPAIRS, REPLACEMENTS, MAINTENANCE AND CAPITAL IMPROVEMENTS

### 12.01  Repairs and Maintenance.

Operator shall at the expense of Owner from time to time make such expenditures for repairs and maintenance for replacements, renewals and additions to Furniture, Fixtures and Equipment and for minor capital improvements as are necessary in its opinion to keep the Hotel in good operating condition as provided in the approved Annual Plan (excluding structural repairs and changes and extraordinary repairs to or replacement of Furniture, Fixtures and Equipment).  If any such repairs or maintenance shall be made necessary by any condition against the occurrence of which Owner has received or is entitled to the benefit of the guarantee or warranty of any supplier of labor or material for the construction of repairs, maintenance or improvements to the Hotel or of the Furniture, Fixtures and Equipment installed therein, then Operator shall invoke said guarantees or warranties in Owner's or Operator's name and Owner will cooperate fully with Operator in the enforcement thereof.

### 12.02  Structural and Extraordinary Repairs.

If structural repairs or changes to the Hotel or extraordinary repairs to or replacement of any Furniture, Fixtures and Equipment shall be required at any time during the Operating Term to maintain the Hotel in good operating condition, or by reason of any laws, ordinances, rules or regulations now or hereafter in force, or by order of any governmental or municipal power, department, agency, authority or officer, or otherwise, or because Operator and Owner jointly agree upon the desirability thereof, then all such repairs, changes or replacements shall be made by Owner (with Operator's administrative and technical assistance, if requested by Owner) at Owner's sole expense and shall be made with as little hindrance to the operation of the Hotel as reasonably possible, as provided in the approved Annual Plan. Notwithstanding the foregoing, Owner shall have the right to contest the need for any such repairs, changes or replacements required by law, ordinance, regulation or order of governmental authority and may postpone compliance therewith, if so permitted by law, and Operator shall cooperate fully with Owner as Owner may request and execute any documents or pleadings as Owner may require, but in such event, Owner shall protect Operator from any loss, cost, damage or expense which may result therefrom, such protection to be in form satisfactory to Operator.  Funds residing in the Capital Reserve shall not be utilized for structural or extraordinary repairs or replacements conducted pursuant to this paragraph 12.02.

BURTON#9/AGMT.24/3mrt

## ARTICLE XIII
## DAMAGE TO AND DESTRUCTION OF THE HOTEL

### 13.01  Owner's Obligation to Repair.



### 13.02  Substantial or Uninsured Loss.

(a)  In the event that the cost of repairing or replacing the damage or destroyed portions of the Hotel is reasonably estimated by Owner to exceed fifty percent (50%) of the replacement cost of the Hotel, Owner may, by written notice to Operator as soon as reasonably practicable following such damage or destruction, but in no event later than 180 days following such damage or destruction, terminate this Agreement, if Owner elects not to complete the repair or replacement of such damage or destruction.

(b)  If such damage or destruction occurs within five (5) years preceding the expiration date of this Agreement and the cost of repairing such damage or destruction is reasonably



13.03   <u>Operator's Reinstatement</u>.

If, following a termination of this Agreement by Operator in accordance with paragraph 13.01 or by Owner in accordance with paragraph 13.02, at any time during the three (3) year period following such termination, Owner repairs, rebuilds or replaces the Hotel or commences to do so, Owner shall give Operator written notice of same and Operator may, within sixty (60) days of the written notice by Owner of its intention to repair, rebuild or replace the Hotel, reinstate this Agreement by written notice given to Owner (with only such amendments as are required due to changes in the type, scope or design of the hotel project).  Operator's reinstatement and the period of the Operating Term remaining following reinstatement shall be subject to the respective rights of the parties set forth in paragraph 9.02 above.  For the purposes of the timing of notices and elections pursuant to paragraph 9.02, the period between termination and reinstatement shall not be deemed part of the Operating Term. Notwithstanding the provisions of this paragraph, Operator shall have no right to reinstate this Agreement if at the time that Owner commences to repair, rebuild or replace the Hotel, Operator shall own, lease or operate another hotel within an area in which such participation would then have been prohibited under paragraph 26.01 if the Agreement had not been terminated.

<u>ARTICLE XIV</u>
<u>INSURANCE</u>

14.01   <u>Coverage</u>.

(a)   Owner and Operator acknowledge and agree that Operator will provide and maintain for the Hotel, at all times throughout the Operating Term, as an Operating Expense of the Hotel, insurance coverage of the kinds and in the amounts carried

59

by Operator at other hotels insured under blanket policies arranged by Operator, which insurance shall include coverage for damage to the Owner's Suites (excluding the personal property therein but including the leasehold improvements thereof; provided, however, Owner shall notify Operator in writing of the replacement value of such leasehold improvements, which replacement value Operator shall assume, unless notified by Owner otherwise, increases from time to time in the same proportion as increases from time to time in the replacement value of the remaining Hotel improvements). Without limiting the generality of the foregoing, such insurance shall exclude earthquake insurance unless such insurance is available without material increase in the premium of the casualty insurance otherwise required hereunder, and shall include:

        (i)  the policies described in Exhibit 14.01 attached hereto;

        (ii) other policies which Operator and Owner shall, from time to time, mutually deem prudent for the operation of a luxury hotel.

        (b)  If Owner wishes any increased amounts or additional forms of insurance other than those arranged by Operator as above, then Owner shall request Operator, in writing, to arrange such insurance and Operator shall make every reasonable effort to arrange such insurance. If, in the view of Operator or Operator's general insurance brokers such insurance would not be obtainable, Operator shall so advise Owner promptly in writing. Owner shall be free thereafter to attempt to arrange such increased amounts or additional forms of insurance, in accordance with the policy requirements set out in paragraphs 14.02 through 14.06 below, until the next policy renewal.

        (c)  If Operator shall, for any reason, be unable to arrange any or all of the insurance described above, then Operator shall so notify Owner promptly in writing, and Owner, thereafter until the next policy renewal, shall be free to attempt to arrange such insurance in accordance with the policy requirements set out in paragraphs 14.02 through 14.06 below.

        (d)  Owner understands that Operator cannot guarantee availability of all coverages, as herein described, throughout the term of this Agreement. If at any time:

        (i)  any coverage described in Exhibit 14.01 is not obtainable in the view of Operator or Operator's general insurance brokers, then Operator shall so notify Owner in writing and Owner shall be free to attempt to arrange such insurance in accordance with paragraphs 14.02 to 14.06 below.

        (ii) any coverage is not obtainable exactly as described in Exhibit 14.01, in the view of Operator or Operator's insurance brokers, then Operator shall substitute the obtainable coverage which most

closely meets the requirements of Exhibit 14.01 in the opinion of Operator and Operator's general insurance brokers. Operator shall, however, notify Owner, in writing, the nature of and any reason for any such deficiency.

(e)  Owner further understands that, notwithstanding the foregoing obligations, risks may exist from time to time which are not insurable or insured. Operator will make every reasonable effort to assure that coverage is arranged to the standard of insurance described in Exhibit 14.01.  Subject to the foregoing, Owner, therefore, shall indemnify, defend and hold Operator harmless for any and all uninsured liability, loss, claim or damage to third parties; provided, however, this indemnity shall be limited as provided in paragraph 21.03 (i) through (v).

14.02  Named Insureds.

All policies required under this Article XIV shall:

(i)  name as insureds, Owner, Operator, Ground Lessor, and/or any Mortgagee and such other parties as Owner or Operator shall require to be named as insureds.

(ii) contain a waiver of subrogation provisions, pursuant to which the insurer waives all expressed and implied rights of subrogation against Owner, Operator and the respective Affiliates of each.

(iii) provide that losses shall be payable to the named insureds as their respective interests may appear.  With respect to insurance on the Hotel structure, if any Mortgagee is an institutional lender and so requires, insurance proceeds may be made payable to Mortgagee or to a bank or trust company qualified to transact business in the state where the Hotel is located, in either instance as trustee for the custody and disposition of the proceeds.  Owner shall use its best efforts to ensure that any Mortgage shall contain a provision to the effect that proceeds from the property insurance shall be promptly made available by Mortgagee, for repair, rebuilding or restoration.

14.03  Policies.

All policies shall include the following provisions:

(i)  such insurance shall be non-contributing with, and shall apply only as primary and not excess to, any other insurance available to the named insured;

(ii) coverage shall not be cancelled, lapsed or materially reduced, except where the insurer has provided the named insureds at least thirty (30) days' advance written notice thereof.

14.04 Insurance Companies.

All insurance shall be taken out by Owner or Operator with insurance companies having a Best Insurance Reports' policyholder rating of not less than "A" and a financial rating of at least "XIII" or the equivalent thereof.

14.05 Certificate of Insurance.

Whenever insurance coverage is arranged by Operator or by Owner in accordance with this Agreement, whichever party has arranged such coverage will direct that up-to-date certificates of such coverage and subsequent renewals or replacements thereof will be delivered to:

(i) the other party, and

(ii) anyone else reasonably designated by the other party.

14.06 Blanket Policies.

(a) Where insurance is provided by Operator, such insurance may be maintained under insurance policies which cover operations other than solely the Hotel. In such event, it is acknowledged and agreed by Owner that the purpose of such blanket policies is to provide mutual benefits to Owner, Operator and owners of other hotels operated by Operator. Operator is hereby authorized to make any amendments, consolidations or changes in either deductibles or the insurer designed to yield net cost reductions to a majority of the participants in any blanket policy.

(b) Where coverage is provided under such a policy or policies, the insurer shall identify the proportion of the total premium which is applicable to the Hotel. The opinion of the insurer with respect to such allocation shall be binding.

14.07 Insurance by Others.

In the event Operator grants any leases, licenses or concessions pursuant to this Agreement, Operator shall require such tenants, licensees and concessionaires to carry insurance in such form and with such limits reasonably acceptable to Owner. Operator shall also require any subcontractor, vendor or maintenance or service firm involved in the operation of the Hotel to carry insurance in such form and with such limits reasonably acceptable to Owner, and naming Owner, Operator and Mortgagee as additional insureds. Such policies shall further provide that Operator and Owner shall receive not less than thirty (30) days'

written notice prior to any cancellation or amendment of such policies.

## ARTICLE XV
### REAL AND PERSONAL PROPERTY TAXES AND MORTGAGES

**15.01  Payment of Taxes.**

All real estate, local improvement, municipal and school, water, capital, personal property, social security withholding, unemployment insurance taxes, and all other rates, license fees, charges, taxes, imposition, or assessments levied against the Hotel or any component part thereof by any competent authority shall be paid prior to the date the same become due and payable, subject to Operator's right to pay by installments to the extent permitted by law. Should funds available from Hotel Bank Accounts not be sufficient to enable Operator to pay such obligations in a timely and complete fashion, Owner or Operator shall supply the deficiency in accordance with paragraphs 4.02, 8.02 and/or 8.04.

**15.02  Contest.**

Notwithstanding the foregoing, Owner may contest the validity of the amount of any such tax or assessment, without prejudice to Operator's rights under this Agreement, provided that such contest in no way jeopardizes the operation of the Hotel.  The costs of such contest shall be an Operating Expense.  Operator shall cooperate with Owner and execute pleadings required for such purpose, provided that (a) Operator is satisfied that the facts set forth in such documents or pleadings are accurate and that such execution or cooperation does not impose any obligation, liability or expense on Operator, and (b) Owner shall reimburse Operator for all out-of-pocket expenses incurred by Operator in connection with such contest.  To the extent that any such tax or assessment affects Operator or Operator's rights under this Agreement, Operator may, as an Operating Expense of the Hotel, contest the validity of the amount of any such tax or assessment and Owner shall cooperate with Operator and execute any documents or pleadings required for such purposes.

**15.03  Mortgages.**

Operator shall not be obligated to pay any principal or interest required to be paid with respect to any Mortgage or other financing in connection with the Hotel, Ground Rent or rent or installment payments for Furniture, Fixtures and Equipment or Hotel building equipment or systems, except from the Hotel Bank Accounts as provided in paragraph 10.08 and 10.09 and except for the effect of the provisions of paragraphs 4.01, 4.02 and 8.02.

## ARTICLE XVI
## USE OF OPERATOR'S TRADE NAMES

16.01 **Name of Hotel; Written Matter Concerning the Hotel**.

During the Operating Term of this Agreement, the Hotel shall at all times be known and designated as the "Four Seasons" together with such other words as from time to time may be selected by Operator, subject to the approval of Owner. Operator's trade marks, distinctive emblems, insignia, logos, slogans or distinguishing characteristics shall be under the exclusive control of Operator, who alone shall be permitted to use them as trade marks in association with Operator's services. During the Operating Term, Owner shall not use or refer to "Four Seasons" or "Inn on the Park" as trade marks except as permitted by Operator. Without restricting the generality of the foregoing, no press releases or other written matter concerning the Hotel prepared by Owner for publication shall be released without Operator's prior written approval.

16.02 **Use of Trade Names following Termination**.

(a) Upon the termination of this Agreement, neither Owner nor any other owner or operator of the Hotel shall have the right to use the words "Four Seasons," "Le Quatre Saisons," or "Inn on the Park" or any of Operator's trade names, trade marks, distinctive emblems, insignia, logos, slogans or distinguishing characteristics as trade marks or otherwise and the right to the use thereof shall continue to be the exclusive property of Operator. Operator shall have the right to remove from the Hotel any signs or other indications of any connection with the Four Seasons Hotels system.

(b) Notwithstanding the foregoing, Owner upon termination of this Agreement shall have the right to use, without any royalty or similar payments to Operator, all of the then existing Operating Equipment and Supplies even though marked with the name "Four Seasons," "Le Quatre Saisons" or "Inn on the Park," or with the other related characteristics until fully consumed. Owner's right to such use shall be subject to the execution by it of a registered user agreement or other applicable document consistent with the foregoing protecting Operator's ownership of its trade marks. If, however, within fifteen (15) days after termination Operator offers to buy any or all of said Operating Equipment and Supplies bearing the name "Four Seasons," "Le Quatre Saisons" or "Inn on the Park" or any Four Seasons trade marks, emblems, logos, slogans, insignia, or distinguishing characteristics, at the replacement cost thereof to Operator, Owner shall cease to use same and shall sell same to Operator.

64                    BURTON#9/AGMT.24/3mrt

**16.03   Operator May Seek Judicial Relief.**

Operator shall have the right (which right shall survive the termination of this Agreement) to seek injunctive or other relief as may be available at law or in equity in a court of competent jurisdiction to enforce the foregoing provisions of this Article XVI, notwithstanding the arbitration provisions contained in this Agreement.

**ARTICLE XVII**
**CONDEMNATION**

**17.01   General; Complete Condemnation.**

If the whole of the Hotel shall be taken or condemned in any eminent domain, expropriation, compulsory acquisition or like proceedings, or if such a portion thereof shall be so taken as to make it imprudent or unreasonable, in Owner's and Operator's reasonable opinion, to operate the remaining portion as a luxury hotel, then, in either of such events, this Agreement shall be deemed to have terminated as of such time as Operator shall be required to surrender possession of the Hotel or cease operation thereof as a consequence of such taking.  Owner shall receive the whole of any award for any complete expropriation; provided, however, that Operator may separately claim for, prove and receive an award for any separately compensable rights of Operator taken in such expropriation, except that in no event shall Operator's separate action or award result in or cause the amount of any award to Owner to be less than the fair market value of the Hotel encumbered by this Agreement.

**17.02   Partial Condemnation.**

If only a part of the Hotel shall be taken and the taking of such part does not make it financially or operationally unreasonable or imprudent, in Owner's and Operator's reasonable opinion, to operate the remaining portion (of the standard of operation then applicable to the Hotel), this Agreement shall not terminate and out of the award to Owner so much thereof as shall be reasonably necessary to repair any damage to the Hotel or any part thereof, or to alter or modify the Hotel or any part thereof, so as to render the Hotel a complete and satisfactory architectural unit as a luxury hotel, shall be used by Owner for such repairs, alterations or modifications. The remainder of such award, if any, shall be retained by Owner; provided, however, that Operator may separately claim for, prove and receive an award for any separately compensable rights of Operator taken in such condemnation, except that in no event shall Operator's separate action or award result in or cause the amount of any award to Owner to be less than the sum of the cost to repair, alter or modify the Hotel as herein provided, plus the amount of the fair market value of the portion of the Hotel so taken encumbered by this Agreement.

BURTON#9/AGMT.24/3mrt

17.03  <u>Temporary Condemnation</u>.

If all or any part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceeding for a temporary use, this Agreement shall not terminate and the awards or other proceeds paid on account of such event (other than any portion specifically identified as compensation for alterations or damages to the Hotel, which shall be payable to Owner and utilized for alterations and repairs) shall be paid to Owner.  When and if during the term of this Agreement, the period of temporary use shall terminate, Owner shall make all such restoration, repairs and alterations as shall be necessary to restore the Hotel to its condition prior to such condemnation for temporary use. Following such period of temporary use, this Agreement and the Operating Term hereof shall be automatically extended for a period equal to the duration of the period when the Hotel was not available for occupancy due to such temporary condemnation.

<u>ARTICLE XVIII</u>
<u>ASSIGNMENT BY OWNER</u>

18.01  <u>Owner's Right to Assign</u>.

Subject to the provisions of paragraph 18.03 hereof, Owner shall have the right at any time to sell, assign or transfer all or a part of its right, title and interest in the Hotel, or in this Agreement, and be relieved of any liability arising thereunder from and after the date of such transfer, to any person or entity on the conditions that: (a) this Agreement continues in full force and effect after the said transfer (with such amendments to the definitions in Article I hereof as may be appropriate); and (b) that the transferee assume the obligations of Owner in accordance with the terms and conditions hereof.  Any such transferee shall be entitled to any and all of the rights of Owner herein, including without limitation the right to an FRP Loan described in paragraph 8.02(b) hereof, subject to the limitations on the Cohen Loans and LC Loan set forth in paragraphs 4.02 and 4.01, respectively, hereof.  Transfers of ownership interests in the entity constituting Owner shall not constitute a change or transfer of the position of Owner under this Agreement provided, however, that:

(a) any such transfer, to the extent expressly provided in this Agreement, may constitute a "sale or transfer of the Hotel";

(b) Owner, as constituted following any such transfer, shall remain fully liable for the obligations of Owner under this Agreement, and

(c) nothing in this paragraph shall affect the application of the express restrictions set forth in paragraph 18.03 below with respect to any such transfer.

66

18.02  <u>Owner's Right to Mortgage</u>.

(a) Owner shall have the right at any time to mortgage, hypothecate or otherwise encumber all or part of its right, title and interest in the Hotel or in this Agreement to any person or entity on the condition that such Mortgagee shall enter into an agreement with Operator, in form and substance reasonably satisfactory to Operator,

(i)  agreeing to be bound by Owner's covenants and undertakings hereunder for any period during which it is in possession of the Hotel,

(ii) agreeing that in the event of a Foreclosure of its Mortgage or lien on the Hotel or of a conveyance in lieu of Foreclosure, (i) no default under said Mortgage or other documents evidencing the lien in favor of said Mortgagee, and no proceeding to foreclose the same, and no conveyance in lieu of foreclosure thereof, will disturb Operator's right to manage the Hotel pursuant to this Agreement, or affect any other right of Operator under this Agreement and (ii) this Agreement shall continue in full force and effect and such Mortgagee, its successors and assigns or any party (the "Foreclosure Purchaser") acquiring the Hotel or any interest or right therein upon Foreclosure sale or by deed in lieu thereof, as the case may be, shall automatically recognize this Agreement and Operator s rights hereunder for the balance of the Operating Term of this Agreement, upon the same terms, covenants and conditions as herein provided, with the same force and effect as though this Agreement was originally made directly between Operator and said Mortgagee, or its successors and assigns or the Foreclosure Purchaser, as the case may be; and

(iii) agreeing not to sell, transfer or otherwise dispose of any interest it may have in the Hotel without first causing any transferee thereof to be bound by and become a party to such agreement.

18.03  <u>Limitation on Owner's Rights</u>.



BURTON#9/AGMT.24/3mrt



BURTON#9/AGMT.24/3mrt



18.04  [Intentionally Omitted]

18.05  <u>Ground Lessor's Non-Disturbance Agreement</u>.

        Owner and Operator acknowledge that the Lessor under the Ground Lease has executed and recorded in the Office of the Recorder of Los Angeles County an agreement with Operator dated as of October 31, 1989 pursuant to which such Lessor has agreed (a) to be bound by Owner's covenants and undertakings hereunder following it's succession to Owner's interest in the Hotel, including, without limitation, the covenants and undertakings set forth in paragraph 9.02, (b) no termination of the Ground Lease shall occasion a termination of or disturb this Agreement, (c) following the expiration or earlier termination of the Ground Lease, the Lessor shall automatically recognize this Agreement and Operator's rights hereunder for the balance of the Operating Term of this Agreement, including any extensions and renewals hereof, upon the same terms, covenants and conditions as herein provided, with the same force and effect as though this Agreement was originally made directly between Operator and the Lessor, and (d) not to sell, transfer or otherwise dispose of its Fee Interest without first causing any transferee thereof to be bound by and become a party to such non-disturbance agreement; provided, however, any financing, refinancing, mortgaging, encumbering or other such hypothecation shall not be deemed to constitute a sale, transfer, or other disposition of its Fee Interest unless and until the lender succeeds, if at all, whether by foreclosure or a deed in lieu thereof, to ownership of such Fee Interest.  Operator acknowledges and agrees that, except as otherwise expressly provided in the foregoing provisions of this paragraph 18.05, nothing in this Agreement is intended to or shall (1) confer upon Operator any interest or right whatsoever in or with respect to the Fee Interest or (2) restrict the Ground Lessor's rights with respect to its Fee Interest under the Ground Lease.

## ARTICLE XIX
## EVENTS OF DEFAULT AND TERMINATION

19.01  General.

Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

(a) the failure of Operator to disburse any amount to Owner provided for herein, or the failure of Owner to pay any amounts required to be paid by it hereunder or to perform any of its obligations herein for a period of thirty (30) days after the date on which notice of the failure has been given to the defaulting party by the other party;

(b) the failure of Operator to maintain the Guaranty LC as required by paragraph 4.01;

(c) the failure of Operator to maintain the letter of credit or guaranty which may be required as security for the Working Capital Line pursuant to the provision of paragraph 8.04 herein;

(d) the filing of a voluntary assignment in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by Owner (but not any constituent partner in Owner) or Operator;

(e) the consent to an involuntary petition in bankruptcy or the failure by Owner (but not any constituent partner in Owner), or Operator to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

(f) the making of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner (but not any constituent partner in Owner), or Operator a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of a party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days; and

(g) the failure of either Owner or Operator to fulfill any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of thirty (30) days after written notice of said failure, provided however that if, upon receipt of any notice, the defaulting party

promptly and with all due diligence cures the
default or, if the default is not susceptible of
being cured within the thirty (30) day period and
the defaulting party advises the other party in
writing of the period which will be required to cure
the default and with due diligence takes and
continues action to cure and cures the failure
within that period so advised, then no event of
default shall be deemed to have occurred unless and
until the defaulting party has failed to take or to
continue to take action or to complete the cure
within the period.

19.02 <u>Rights of Non-Defaulting Party</u>.

Upon the occurrence of any event of default pursuant to
paragraph 19.01 hereof, the non-defaulting party may, without
prejudice to any other recourse at law which it may have, give to
the defaulting party notice of its intention to terminate the
Operating Term and this Agreement after the expiration of a period
of thirty (30) days from the date of such notice and, upon the
expiration of such period, the Operating Term shall expire and this
Agreement shall be deemed terminated. If, however, upon receipt of
such notice, the defaulting party shall promptly and with all due
diligence cure the default within thirty (30) days of such notice
or if such default is not susceptible of being cured within said
thirty (30) day period, take and continue action to cure such
default with all due diligence until the same is cured, then such
notice shall be of no force and effect. Notwithstanding the
foregoing, neither Owner nor Operator shall have a right to seek
damages for or upon the occurrence of the events of default set
forth in Sections 19.01(d) through (f).

19.03 <u>Remedying Defaults</u>.

Notwithstanding anything to the contrary contained in
this Agreement, either party shall be entitled to remedy any
default of the other under this Agreement with reasonable notice
to the other or without notice in the event of any emergency or
apprehended emergency, without prejudice to any rights under this
Agreement, and the party so remedying such default shall be repaid
upon demand by the defaulting party for the cost of remedying such
default together with interest on such amount from the date of
incurring such cost at an annual rate of interest equal to the
lesser of (a) the highest rate then currently charged to such party
by such party's principal lending sources plus ▓▓▓▓▓▓▓▓▓ or
(b) the maximum legal rate.

19.04 <u>Bona Fide Dispute</u>.

Notwithstanding the foregoing, neither Owner nor Operator
shall be deemed to be in default under this Agreement if a bona
fide dispute with respect to any of the foregoing events of
default has arisen between them and such dispute may be the subject
of termination hereunder and has been or is submitted to

arbitration prior to the expiration of the thirty (30) day notice period referred to in paragraph 19.02 hereof.

19.05  Owner's Rights to Terminate.

In addition to any right arising out of paragraph 19.02 above, Owner shall have the following rights to terminate this Agreement:

(a)  At any time within one (1) year following the 25th Fiscal Year of the Operating Term, Owner shall have the right to terminate this Agreement upon not less than ninety (90) days prior written notice to Operator if Owner determines to terminate the use of the improvements situated upon the Land as a hotel, provided, however, that if Owner should at any time within a period of five (5) years following such termination of this Agreement determine to commence operation of such improvements as a hotel, Owner shall give to Operator prompt written notice of such determination.  Operator may elect, by written notice given to Owner within thirty (30) days following receipt of Owner's notice or, if no such Owner's notice is given, Operator's actual knowledge of such commencement, to reinstate this Agreement; .

(b)  If, at any time following the fifteenth (15th) Fiscal Year of the Operating Term, Owner should contract to sell or transfer the Hotel in an arm's length transaction to an unrelated third party, Owner may elect, by written notice given to Operator, to terminate this Agreement effective upon two (2) years' written notice of such proposed sale or transfer and to pay to Operator on the date of such sale or transfer a termination compensation payment equal to the fair market value of Operator's interest under this Agreement, taking into account all fees and payments due Operator throughout the Operating Term of this Agreement.  For purposes of calculating the aforementioned "termination compensation payment," the value thereof shall be a sum equal to the present value as of the date of such termination (plus interest .to the date of such payment) of Operator's interest in this Agreement as determined by Laventhal and Horwath or Pannell, Kerr, Foster, or other independent firm of international hotel management consultants or accountants acceptable to both parties. Owner and Operator shall use their mutual best efforts to cause such determination to be made as promptly as possible following Owner's notice of termination. Upon receipt of such notice Operator may elect (i) to accept termination of this Agreement together with the compensatory payment or (ii) to purchase, or arrange for a third party to purchase, the Hotel on terms and conditions no less favorable to Owner than those set forth in the contract between Owner and the unrelated third party.  Operator may exercise such election by written notice given to Owner at any time within sixty (60) days following receipt of Owner's written notice setting forth the terms of the proposed sale and the proposed termination of this Agreement, with the closing of the transaction to occur no later than one hundred twenty (120) days thereafter. In calculating the value of the remaining term of this Agreement no consideration shall be given to the extension rights set forth in

72                    BURTON#9/AGMT.24/3mrt

paragraph 9.02 above or the termination rights or payment set forth in this paragraph 19.05.  Notwithstanding anything to the contrary contained or implied in this paragraph, Owner shall have the right to sell or transfer the Hotel at any time subject to paragraphs 18.01 and 18.03;



73                          BURTON#9/AGMT.24/3mrt



(d)   Owner shall have the right to terminate this Agreement by written notice given to Operator if, at any time, Operator shall cease to operate the hotels in Operator's system to the standard of luxury class hotels in effect as of the date of this Agreement.

## ARTICLE XX
## ASSIGNMENT BY OPERATOR

### 20.01   Permitted Assigns.

Operator shall have no right to assign all or any portion of this Agreement except insofar as Operator grants any leases, licenses or concessions for stores constituting part of the Hotel and office space and lobby space in the Hotel, as permitted in this Agreement.  Notwithstanding the provisions of the preceding two (2) sentences, so long as there does not exist any incurred default by Operator under this Agreement Operator shall have the right without consent to assign all of its right, title and interest under this Agreement to (a) any Affiliate of Operator which enjoys all the benefits of Operator's organization and whose ongoing performance at the standard set forth in this Agreement is guaranteed by Operator, or (b) any corporation that results from any merger, consolidation or reorganization of Operator or acquisition of all or substantially all of Operator's assets and continues to conduct Operator's hotel management business, such new operator is an experienced operator of luxury class hotels and shall continue to operate under the name "Four Seasons" all hotels presently owned or operated by Operator, and shall not use the name "Four Seasons" in connection with less than luxury class hotels, and such new operator shall after conclusion of any merger, consolidation or reorganization of Operator or acquisition of all of Operator's assets, have a net worth equal to or greater than Operator at the time of such merger or acquisition; provided that it shall be a condition precedent to the effectiveness of the assignment, sublease or transfer that the assignee or sublessee or transferee agrees directly with Owner to be bound by all of Operator's obligations under this Agreement.  Notwithstanding the provisions of clause (a) above, Operator shall not have the right to assign its right, title and interest under this Agreement to an Affiliate with the intent of transferring ownership of such Affiliate to a third party and thereby avoid the prohibition

74                    BURTON#9/AGMT.24/3mrt

against direct assignment of this Agreement to such party set forth
in the first sentence of this paragraph.

### ARTICLE XXI
### OPERATOR'S LIABILITY

**21.01**  **General; Standard of Care.**

        Operator shall not, in the performance of this
Agreement, be liable to Owner or to any other person for any act or
omission, negligent, tortious or otherwise, of Operator or of any
agent or employee of Owner or Operator, or of Operator's
Affiliates, except to the extent such liabilities, obligations,
claims, costs and expenses arise out of or are caused by (a) the
gross negligence or willful misconduct by Operator or any member of
the executive staff of the Hotel (i.e., the General Manager,
Executive Manager, Food and Beverage Manager, Controller and
Director of Marketing), including any person entitled to draw from
the line of credit referred to in paragraph 8.04 (but excluding any
such gross negligence or willful misconduct of any employee who is
not a member of the executive staff of the Hotel), or (b)
negligence in the hiring or firing of employees.  Operator shall
indemnify, defend and hold Owner harmless from and against all
liabilities, obligations, claims, costs and expenses (including,
but not limited to attorneys' fees) arising out of or caused by (a)
the gross negligence or willful misconduct by Operator (or any
employees who are members of the executive staff of the Hotel) or
any such member of the executive staff of the Hotel or (b)
negligence in the hiring or firing of employees.  However,
notwithstanding anything to the contrary contained in this
Agreement, including the preceding two (2) sentences, Operator
shall be liable to Owner for breach of this Agreement (which breach
may or may not (depending on the circumstances and the terms of the
Agreement) arise as a result of Operator's negligence), except for
liability of Owner to third parties as a result of Operator's
ordinary negligence (other than negligence in the hiring or firing
of employees).  Except as otherwise expressly provided herein,
Owner shall have no claim of any nature against Operator relating
to any labor relations matters and, except as otherwise expressly
provided in this Agreement (including the preceding sentence with
respect to Operator's liability to Owner as a result of a breach of
this Agreement), Owner shall not make any claim against Operator,
or any Affiliate of Operator on account of any alleged errors of
judgment where such judgment is exercised in good faith in
connection with the operation of the Hotel hereunder by Operator or
the performance of any technical services provided by or arranged
by the Operator.

**21.02**  **Accounting.**

        In the event of the termination of this Agreement, all
accounts shall be made up to the date of actual cessation of
operations of the Hotel by Operator.  Operator shall be reimbursed

for its reimbursable expenses, if any, to such date and, to the extent not forgiven, shall be paid any accrued and unpaid Incentive Fees, sums advanced under paragraph 8.03, plus interest, the Basic Fee, Corporate Sales and Marketing Charge, Corporate Advertising Charge, Centralized Reservation Service Charge, Refurbishing Fee, Centralized Purchasing Fee, adjusted equitably to the date of the termination, and any other sums payable to Operator under this Agreement. Operator shall account to Owner for and pay to Owner all monies due Owner under the terms and provisions hereof.

### 21.03  Indemnity.

Owner hereby indemnifies and holds Operator harmless from and against any and all liability, fines, suits, claims, obligations, damages, penalties, demands and actions and costs and reasonable expenses of any kind or nature (including reasonable attorneys' fees) by anyone whomsoever, arising out of any action or omission or course of action on the part of Operator in the performance of its duties hereunder or otherwise in connection with the operation, maintenance or condition of the Hotel; expressly excluding however from such indemnity (i) any liability arising out of or caused by the gross negligence or wilful misconduct of Operator (or members of its executive staff, but excluding employees of the Hotel who are not members of the executive staff of the Hotel), (ii) any liability due to the breach by Operator of this Agreement or any other agreement between Owner and Operator, (iii) any liability to third parties due to negligence in the hiring or firing of employees, (iv) any overhead or administrative costs, charges or expenses of Operator except as expressly permitted in paragraph 10.04 herein, and (v) any liability from and against which Operator has agreed to indemnify and hold harmless Owner.  The parties intend that all agreements by Owner to indemnify Operator which are contained herein and all provisions herein pursuant to which Operator's liability is limited shall be construed so as to be consistent with the terms of this paragraph 21.03 (i) through (v) regarding limitations on Owner's obligation to indemnify and in the event any indemnification agreement by Owner herein does not expressly contain such limitations, it shall be deemed to contain the same by virtue of this sentence.

### ARTICLE XXII
### ARBITRATION

### 22.01  Manner; Allocation of Cost.

Except as to matters to be determined under this Agreement by auditors and as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration as follows:

(a)  Each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration.  Within ten (10) days after receipt by the other party of such notice, each party shall appoint an arbitrator and the two (2) arbitrators thus chosen shall together within ten (10) days of

their appointment nominate a third arbitrator.  In the event the two (2) arbitrators shall fail within such period to select the third party, upon written request of either party hereto, the third arbitrator shall be appointed by a Judge of the United States District Court for the Central District of California and both parties shall be bound by the appointment so made.  If a party hereto shall fail to appoint an arbitrator as required hereunder, the arbitrator appointed shall be the sole arbitrator of the matter.

   (b)  The decision of the arbitrators (or such single arbitrator) shall be made within seven (7) business days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator, as the case may be) when reduced to writing and signed by them shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction.

   (c)  Such arbitration shall be held at such locations as said arbitrators (or arbitrator, as the case may be) shall determine and, except for those procedures specifically set forth in this paragraph, shall be conducted in accordance with the relevant rules of California Code of Civil Procedure Sections 1200 et seq. as in effect on the date hereof.  The parties to the arbitration shall have the right to discovery in accordance with California Code of Civil Procedure Section 1283.05

   (d) The arbitrators (or arbitrator, as the case may be) shall determine which party shall assume the expense of such arbitration or the proportion of such expenses which each party shall bear, including attorneys' fees.

**ARTICLE XXIII**
**CONSENT**

23.01  **When Consent May Be Withheld**.

   Whenever in this Agreement the consent or approval of Operator or Owner is required, the consent or approval shall not unreasonably be withheld or delayed.  In determining the reasonableness of any such withholding or delay full consideration shall be given to the circumstances in which the consent or approval is alleged to have been unreasonably withheld or delayed.

**ARTICLE XXIV**
**OWNER HAS NOT RELIED ON REPRESENTATION**

24.01  **Owner's Understanding**.

   Owner hereby represents that in entering into this Agreement Owner has not relied on any statements as to the possibility of future success or as to any similar matter which may have been prepared by Operator, or by any of its Affiliates, and

understands that no guarantee is made or implied by Operator, or by any of its Affiliates as to the future earnings or financial success of the Hotel.

### 24.02  Operator's Understanding

Operator hereby represents that in entering into this Agreement, Operator has not relied on any statement from Owner or any representative or partner of Owner and has conducted such due diligence and investigation as it deems appropriate before entering into this Agreement.

### ARTICLE XXV
### NOTICES

### 25.01  Manner; Addresses.

Unless otherwise provided in this Agreement, all notices, statements, consents, approvals, requests, demands or other communications required to be given under this Agreement shall be in writing and shall be given to the party entitled thereto by personal delivery, by telecopy with receipt confirmed, by Federal Express or other similar overnight courier service, or by certified or registered first-class mail, postage prepaid, return receipt requested, sent to the addresses set forth below (or such other address or addresses as may be designated by the parties from time to time):



BURTON#9/AGMT.24/3mrt

Delivery of notices, statements, consents, approvals, requests, demands or other communications, shall be deemed to occur upon actual receipt, whether by telecopy or otherwise.

## ARTICLE XXVI
## MISCELLANEOUS

### 26.01  Freedom of Action: Radius Restrictions.

(a) During the first fifteen (15) Fiscal Years of the Operating Term, Operator shall not own, lease or operate a hotel within a radius of fourteen (14) miles from the Hotel. At no time during the term of this Agreement shall Operator own, lease or operate a hotel within a radius of eight (8) miles from the Hotel. Subject to the foregoing, Operator may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including but not limited to the ownership, financing, leasing, operation, management, brokerage and development of real property. Owner shall not have any right by virtue hereof in and to such other business venture or to the income or profits derived therefrom.  In addition, Operator shall be free to own, lease or operate a hotel beyond the then applicable radius restriction regardless of competitive impact upon the Hotel.

### 26.02  Headings.

The headings or the title to the general articles and sections of this Agreement are inserted for convenience of reference only and are not intended to affect the meaning of any of the provisions.

### 26.03  Waivers.

The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any other occasion.

### 26.04  Limitation on Interest.  Owner and Operator intend to contract in strict compliance with applicable usury laws from time to time in effect.  In that regard, Owner and Operator stipulate and agree that none of the terms and provisions contained in this Agreement shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect. Neither, Owner nor any future guarantors, endorsers, or other

79                    BURTON#9/AGMT.24/3mrt

persons or entities hereafter becoming liable for payment of the LC Loan or the FRP Loan shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully charged under applicable law from time to time in effect, and the provisions of this paragraph shall control over all other provisions of this Agreement which may be in conflict or apparent conflict herewith.  Operator disavows any intention to charge or collect excessive unearned interest or finance charges in the event the maturity of the LC Loan or the FRP Loan is accelerated.  If Operator shall collect moneys which are determined to constitute interest which would otherwise increase the interest on the LC Loan or the FRP Loan to an amount in excess of that permitted to be charged by applicable law then in effect, then all such sums determined to constitute interest in excess of such legal limit shall, without penalty, be promptly applied to reduce the then outstanding principal of the LC Loan or the FRP Loan, as the case may be, or, at Operator's option, promptly returned to Owner or the other payor thereof upon such determination.  In determining whether or not the interest paid or payable, under any specific circumstance, exceeds the maximum amount permitted under applicable law, Operator and Owner (and any other payors thereof) shall to the greatest extent permitted under applicable law, (i) characterize any nonprincipal payment as an expense, fee or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, (iii) amortize, prorate, allocate, and spread the total amount of interest throughout the entire contemplated term of the LC Loan or the FRP Loan, as the case may be, in accordance with the amounts outstanding from time to time thereunder and the maximum legal rate of interest from time to time in effect under applicable law in order to lawfully charge the maximum amount of interest permitted under applicable law.  This paragraph 26.04 is not intended in any way, and shall not be deemed or construed, to permit Operator to charge more interest than expressly permitted to be charged under paragraphs 4.01(c) and 8.02(b), as the case may be, of this Agreement.

### 26.05  Applicable Law.

This Agreement shall be construed, interpreted and applied in accordance with and shall be governed by the laws applicable in the State of California.  Operator agrees that the Superior Court of the State of California in and for the County of Los Angeles shall have jurisdiction to hear and decide any dispute, controversy or litigation regarding the enforcement or validity of this Agreement.

### 26.06  Entire Agreement.

This Agreement constitutes the entire agreement between Owner and Operator governing their relationship with respect to the management of the Hotel and, subject to paragraph 26.12, supersedes all prior agreements including the Original Agreement and the First Amendment.  Notwithstanding the foregoing, the parties do not intend that certain Closing Agreement and Joint Escrow

Instructions executed by and between the parties hereto prior to
the Closing Date, and pursuant to which the parties agreed, among
other things, to execute this Agreement (as amended and restated)
on the Closing Date (the "Closing Agreement") shall be superseded
hereby.  The parties intend that this Agreement shall be
interpreted consistently with the Closing Agreement but, to the
extent of any inconsistency between such agreements on issues dealt
with in the Closing Agreement, the terms and provisions of the
Closing Agreement shall prevail.  This Agreement may be amended
only by an instrument in writing executed by Owner and Operator.

### 26.07    Counterparts.

This Agreement may be executed simultaneously in two or
more counterparts, each of which counterparts shall be deemed an
original.  In proving the terms of this Agreement it shall not be
necessary to produce or account for more than one of the originally
executed counterparts provided a legible copy of the other
counterpart is produced or accounted for.

### 26.08   Time of Essence.

Time shall be of the essence in the performance of this
Agreement.

### 26.09   Estoppel Certificates.

Owner and Operator each, upon at least ten (10) days'
notice, shall execute and deliver to the other and to any third
party having or about to have a bona fide interest in the Hotel as
such other party may designate in writing certifying that this
Agreement is unmodified and in full force and effect, or if not,
stating the details of any modification and stating that as
modified it is in full force and effect, the date to which payments
have been paid and whether or not there is any existing default on
the part of the other and any other matters reasonably requested by
such party.

### 26.10   Currency.

Unless otherwise expressly provided herein, all
references to amounts of currency shall be deemed to refer to
United States Dollars.

### 26.11   Partial Invalidity.

In the event that any one or more of the phrases,
sentences, clauses or paragraphs contained in this Agreement shall
be declared invalid or unenforceable by order, decree or judgment
of any court having jurisdiction, or shall be or become invalid or
unenforceable by virtue of any duly promulgated law, rule or
regulation, the remainder of this Agreement shall be construed as
if such phrases, sentences, clauses or paragraphs had not been
inserted except when such construction (a) would operate as an
undue hardship on either party or (b) would constitute a

substantial deviation from the general intent and purposes of the
parties as reflected herein.  In the event of either (a) or (b)
above, the parties will use their best efforts to negotiate a
mutually satisfactory amendment to this Agreement to circumvent
such adverse construction.  If no such amendment has been agreed
upon within sixty (60) days the dispute shall be submitted to
arbitration in accordance with the provisions of Article III
hereof.

26.12  <u>Transitional Provisions</u>.

Except as otherwise expressly provided herein (including
without limitation the provisions of paragraph 10.06(b) regarding
forgiveness of accrued Incentive Fees and any interest thereon and
paragraphs 10.02 and 10.03 regarding payment of certain centralized
service charges to Operator), all fees, payments and other amounts
which accrue over time which are to be calculated differently
hereunder than under the Original Agreement shall be calculated as
provided in the Original Agreement to the extent such fees,
payments and other amounts accrue prior to the Closing Date and
shall be calculated as provided in this Agreement (as amended and
restated) to the extent such fees, payments and other amounts
accrue on and after the Closing Date.  Except as otherwise
expressly provided herein, all fees, payments and other amounts
which accrue over time which are provided for either hereunder or
under the Original Agreement (but not under both) shall be prorated
during the current fiscal year upon the basis of that portion of
the current Fiscal Year in which the Original Agreement or this
amended and restated Agreement, as the case may be, is in effect.
Notwithstanding the foregoing (i) upon and after the Closing Date,
the calculations described in paragraphs 10.05(b) and 19.05(c) of
this Agreement (and not corresponding provisions, if any, under the
Original Agreement) shall apply even where such calculations relate
to periods prior to the Closing Date and (ii) any expenses, fees,
interest or payments which are forgiven herein shall be forgiven
notwithstanding they relate to periods prior to the Closing Date.

26.13  <u>Operator Not Third Party Beneficiary to Amended
Partnership Agreement</u>.

Operator acknowledges and agrees that the parties to the
Partnership Agreement and/or the Ground Lease did not and do not
intend Operator to be a third party beneficiary thereunder and
Operator hereby waives any right to claim third party beneficiary
status with respect to the Partnership Agreement, the Ground Lease,
or any provision of either instrument other than expressly stated
in the Partnership Agreement or the Ground Lease.

26.14  <u>Third Party Beneficiaries</u>.

Nothing in this Amendment is intended or shall be
construed to give any persons other than the parties hereto (and
any successors and assigns as set forth in paragraph 26.17) and the
other persons listed below, with respect to the provisions of this
Agreement set forth besides their names (and the respective

successors-in-interest of each of the foregoing), any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein, other than as expressly stated in the Partnership Agreement or the Ground Lease.

| Third Party Beneficiary: | With Respect to Provisions of: |
|---|---|
| The Cohens | ¶ 4.02 |
| Lessor under Ground Lease | ¶ 4.03(b), ¶10.08(d) and ¶ 18.03(d) |
| The lessees of Owner's Suites under the Owner's Suite Leases | ¶ 5.08 and ¶ 18.03(d) |

26.15  **Attorneys' Fees.**

In the event that any of the parties must resort to legal action in order to enforce the provisions of this Agreement or to defend such suit, the prevailing party shall be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such suit.

26.16   **Interpretation.**

Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party. Each party hereto has been represented by outside legal counsel, each of which has participated in extensive negotiations and the drafting of all of the terms and conditions contained herein. Thus this Agreement shall not be construed against any particular party as having prepared it, but shall be construed in light of the fact that all parties hereto had a fair opportunity for extensive input into the preparation of this Agreement. Wherever used herein, the words "include" and "including" shall mean including without any limitation. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. The term "persons" means any individual, corporation, partnership, trust or other entity. The consent or approval of the two managing general partners of Owner shall be the consent or approval of Owner for all purposes where Owner's consent or approval shall be required hereunder.

26.17   **Payment of Legal Fees and Out-of-Pocket Expenses.** It is the understanding of Owner and Operator that all legal fees and out-of-pocket expenses incurred by each party in connection with the preparation, negotiation and execution of this Agreement shall be paid for separately by the respective party incurring such expense. In this regard, all such fees, costs and expenses of Kaye, Scholer, Fierman, Hays & Handler shall be the sole

responsibility of Owner and all such fees, costs and expenses of Pettit & Martin shall be the sole responsibility of Operator.

### 26.18   Binding Effect

Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, heirs, administrators, executors, and permitted successors and assigns.

IN WITNESS WHEREOF the parties have duly executed this Agreement the day and year first above written.

FOUR SEASONS HOTELS LIMITED

By: _____

By: _____

BURTON WAY HOTELS, LTD.,
a California Limited Partnership

By: _____
Joseph Cohen
General Partner

By: _____
Robert Cohen
General Partner

By: _____
Ernest Cohen
General Partner

84

BURTON#9/AGMT.24/3mrt

**EXHIBIT  B**

## FIRST AMENDMENT TO THE AMENDED AND RESTATED
## HOTEL MANAGEMENT AGREEMENT FOR THE
## FOUR SEASONS HOTEL, LOS ANGELES

This First Amendment to the Amended and Restated Hotel Management Agreement ("Amendment") is effective as of December 22, 1998 and is hereby made and incorporated as part of, and hereby amends, that certain Amended and Restated Hotel Management Agreement between Four Seasons Hotels Limited, a corporation incorporated under the laws of the province of Ontario, Canada ("Four Seasons" or "Operator") and Burton Way Hotels, Ltd., a California limited partnership ("Burton Way" or "Owner") which was entered into as of October 31, 1989 ("Agreement"). Capitalized terms used herein and not otherwise defined have the meanings set out in the Agreement. This Amendment controls over anything inconsistent in the Agreement. Except as modified by this Amendment and the documents contemplated by the parties to be executed contemporaneously with this Amendment, the provisions of the Agreement remain in full force and effect.

WHEREAS over the past several years various matters have arisen concerning the Agreement which the parties desire to settle and resolve (without any party admitting or requiring the other to admit any fault, default or liability with respect to the matters in dispute) by way of this Amendment, as further provided below; and

WHEREAS, Burton Way desires that Four Seasons no longer have (and that Four Seasons release) any interest in the Capital Loans and that the Cohen Loans be discharged, cancelled and forgiven by Four Seasons and Four Seasons is willing to discharge cancel and forgive the Cohen Loans;

NOW THEREFORE, for good consideration had and received, the parties agree to the foregoing and as follows:

1. **Certain Amendments**

Sections 1.01(r), 1.01(dd), 1.01(hh), 1.01(mm), 1.01(yy), 1.01(zz), 1.01(ddd) 4.01, 19.01(b) and Exhibit 4.01 of the Agreement are hereby deleted and of no further force or effect effective as of the date of this Amendment. Similarly, all references to "LC Loan" in Sections 10.08(e), 18.01 and 26.04 of the Agreement and all references to paragraph "4.01" in Sections 8.03, 8.05, 8.08, 15.03, 18.01 and 26.04 of the Agreement and the reference to "Deed of Trust" in paragraph 18.03(d) of the Agreement are hereby deleted and of no further force or effect effective as of the date of this Amendment. Notwithstanding anything to the contrary contained here or elsewhere, the Partnership Agreement of Owner may be freely amended without consent, approval, interference or restriction from Operator.

2. **Cohen Loan Discharge**

Concurrently with and in consideration for the execution of this Amendment, Four Seasons will and does hereby cancel, waive, discharge, release and forgive the Cohen Loans, including without limitation, that certain promissory note (a copy of which is attached as **Exhibit 2A**)

evidencing the Cohen Loans ("Cohen Loan Note") and any and all obligations relating thereto (whether consisting of principal, interest or otherwise), of or from Robert, Joseph and Ernest Cohen (the "Cohens"); and further, Four Seasons shall and does hereby release, reconvey, cancel and terminate any right, title and interest it may have (whether by way of that certain Assignment dated July 31, 1990, a copy of which is attached as **Exhibit 2B**, or otherwise) in and to: that certain promissory note ("Capital Note") in the original principal amount of $2,000,000 dated as of the 15th day of February, 1990 with Burton Way as original obligor and the Cohens as original payee (a copy of which is attached as **Exhibit 2C**), and that certain deed of trust of the same date (a copy of which is attached as **Exhibit 2D**) on the Hotel ("Capital Note Trust Deed"). Concurrently, Four Seasons shall and does hereby transfer, deliver and release to the Cohens any and all other documents evidencing or securing the Cohen Loans, and in connection therewith, Four Seasons shall and does hereby concurrently execute and deliver to the Cohens the Acknowledgment of Payoff/Cancellation of the Cohen Loan Note, UCC-2 Termination Statement (for the Cohen Loans) and Termination of Pledge Agreement in form attached as **Exhibits 2E, 2F and 2G**, along with the original Cohen Loan Note marked cancelled and also takes the actions described in paragraph "3" below. Hereafter, there will be no obligation of any of the Cohens under or in connection with any aspect of the Cohen Loans to Four Seasons. Four Seasons hereby represents and warrants that it is the sole owner of the Cohen Loan Note, that it has not previously voluntarily, by operation of law or otherwise, assigned, transferred or purported to assign or transfer to any person any interest in the Cohen Loan Note or in any assets, instruments or collateral securing the same and that it has full power and authority to enter into and execute the transactions contemplated in this paragraph. Because the Cohen Loans are being so discharged, Sections 1.01(m), 1.01(n), and 4.02 of the Agreement are hereby deleted and of no further force and effect effective as of the date of this Amendment. Similarly, all references to paragraph "4.02" in Sections 8.03, 15.01, 15.03, 18.01 and 26.14 of the Amendment, the reference to "The Cohens" in Section 26.14 of the Agreement and the reference to the Cohen Loans in Section 18.01 of the Agreement are hereby deleted and of no further force and effect effective as of the date of this Agreement.

3.      **Release of Four Seasons Security Interest in Capital Loans**



███████████████████████████████████

4.    **Radius Restriction**

    (i)     Section 26.01 of the Agreement is hereby deleted in its entirety and replaced with the following:

26.01   <u>Freedom of Action; Radius Restrictions</u>.

    (a)   During the first fifteen (15) Fiscal Years of the Operating Term, neither Operator nor any Restricted Affiliate shall directly or indirectly own, lease, manage or operate in whole or part, or contract or license any of the Four Seasons Operational Benefits for use in connection with, any hotel within a radius of fourteen (14) miles from the Hotel. At no time during the term of this Agreement shall Operator or any Restricted Affiliate directly or indirectly own, lease, manage or operate in whole or part, or contract or license any of the Four Seasons Operational Benefits for use in connection with, any hotel within a radius of eight (8) miles of the Hotel. Subject to the foregoing, Operator and any Restricted Affiliate may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including but not limited to the ownership, financing, leasing, operation, management, brokerage and development of real property. Owner shall not have any right by virtue hereof in and to such other business venture or to the income or profits derived therefrom. In addition, Operator and any Restricted Affiliate shall be free to own, lease, manage or operate a hotel beyond the then applicable radius restriction regardless of competitive impact upon the Hotel. Notwithstanding the foregoing, (1) a Restricted Affiliate who is not a Control Affiliate or (2) any person or entity who is a Control Affiliate based solely upon its control of Operator (other than Isadore Sharp, members of his family and trusts, family partnerships or other entities maintained for the benefit of any such parties and their respective Control Affiliates) may own, manage, lease or operate (but may not contract or license any Four Seasons Operational Benefits for use in connection with) any hotel within the radius area so long as such hotel is neither a luxury hotel or a hotel which competes with the Hotel.

    For purposes of this Section 26.01:

    (W)  "Four Seasons Operational Benefits" means any of the following, as existing now or from time to time hereafter: (1) any of the names "Four Seasons," "Le Quatre Saisons" or "Inn on the Park" or any of Operator's trade names, trademarks, distinctive emblems, insignia, logos, slogans or distinguishing characteristics; (2) participation in any of the centralized reservations, purchasing or sales and marketing systems providing services for hotels in the system of hotels operated under the "Four Seasons" name; or (3) the services of Operator's senior management personnel if such services in (3) are material, ongoing and provided on a contractual basis;

    (X)  "Control Affiliate" means any person or entity which directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with Operator, with "control" referring to more than 50% (in the case of an entity which is not

publicly traded or sold) of the votes afforded the voting interests (whether stock, LLC membership interests, partnership interests, debt instruments or otherwise), or otherwise effective control, whether direct or indirect;

(Y)   "Restricted Affiliate" means (i) any Control Affiliate(s) or (ii) any entity ("Subject Entity") in which Operator or any Control Affiliate(s) or any combination of the foregoing hold, directly or indirectly, in the aggregate, interests (whether stock, LLC membership interests, partnership interests, debt instruments, rights in management fees, compensation, legal title to hotel or otherwise) representing more than the Applicable Percentage of (A) the amount of capital, profits or net income (whatever the character or source and however denominated, characterized or accounted for) of the Subject Entity or (B) the amount of capital, profits or net income (however denominated, sourced, characterized or accounted for) of the Subject Entity from or relating to any hotel within the prescribed radius area; and

(Z)   "Applicable Percentage" means (A) 20% or (B) 5% (instead of 20%) if the relevant hotel and/or any other hotels located within the prescribed radius area which is/are directly or indirectly owned, leased, managed or operated by the Subject Entity represent(s) more than 20% of the value of all hotels so owned, leased, managed or operated by the Subject Entity.

Further, the terms "indirect" and "indirectly" when used in this Section 26.01 in reference to a percentage interest in a legal entity refers to the product of the percentages connecting a chain of legal entities (e.g., if corporation X owns 50% of corporation Y and corporation Y owns 50% of corporation Z, then corporation X indirectly owns 25% of corporation Z because 50% times 50% equals 25%).

(b)   Notwithstanding paragraph 26.01(a) above and subject to the subsequent provisions of this paragraph 26.01(b), Operator or any Restricted Affiliate may (1) manage or operate the Second Hotel (as defined below) and (2) solely, with respect to the Second Hotel so managed or operated by Operator or any Restricted Affiliate, (A) directly or indirectly, in the aggregate, hold interests (whether through legal title to hotel property, stock, LLC membership interests, partnership interests, debt instruments or otherwise, including any contingent interest, equity kicker, shared appreciation or similar provisions of any Customary Operator Loans) in the Second Hotel representing not more than 25% of the amount of capital, profits or net income (however denominated, sourced, characterized or accounted, except fees attributable solely to management of the Second Hotel and substantially consistent with Operator's then-current fee structures for new and existing management contracts) of the Second Hotel and (B) extend Customary Operator Loans.  The term "Second Hotel" shall mean either (but not both of): (i) the existing single hotel now known as The Regent Beverly Wilshire or (ii) only if, and so long as, (a) neither Operator nor any Restricted Affiliate (with "Restricted Affiliate" (for this purpose only) being determined by using "one one-hundredth of one percent (.01%) as the Applicable Percentage) directly or indirectly leases, manages or operates in whole or part, nor directly or indirectly has or owns any interest (whether through legal title to hotel property, stock, LLC membership interests, partnership interests, debt instruments or otherwise, excluding any accrued fees, reimbursements, outstanding Customary Operator Loans or other payables either in dispute at the termination of management, lease or ownership or payable on an installment basis) in all or part of the existing hotel now known as The Regent Beverly Wilshire and (b) such hotel does not, at such time or thereafter, use or license nor is permitted to use or license

any of the Four Seasons Operational Benefits, then the term "Second Hotel" (i) shall mean another single hotel which is in actual operation and existence on November 15, 1998 within the applicable radius area or (ii) for the period after December 31, 2018 shall mean another single hotel which has been in existence and operation for at least six months and which has less than 400 guest rooms. Operator hereby represents and warrants that as of the date hereof a wholly owned subsidiary of FSR International Hotels Limited (formerly Regent International Hotels Limited) (such subsidiary is referred to as "Regent") is the manager of the Beverly Wilshire Hotel and that Regent is a Restricted Affiliate of Operator and that the interests of Operator and any Restricted Affiliates in the Second Hotel are in compliance with the foregoing provisions. The term "Customary Operator Loans" means loans to the owner of the Second Hotel made by Operator or any Restricted Affiliate pursuant to an obligation to do so in the applicable hotel management agreement for the Second Hotel, which are used to cover operating deficits or Furniture, Fixtures or Equipment ("FF&E") of the Second Hotel and are made on customary terms and in customary amounts when viewed against similar loans made to independent owners of other hotels for which Operator is the manager. Notwithstanding anything to the contrary herein or elsewhere, the Second Hotel shall never be called a "Four Seasons Hotel" or utilize the logo of Four Seasons as part of such hotel's name, except that it may carry as part of its name the identifying by-line containing the words "Four Seasons," an example of which is attached as **Schedule 1**. Operator and any Restricted Affiliate in management may pursue operational and management relationships between the Hotel and the Second Hotel consistent with Operator's obligations under this Agreement and applicable law, except that: (A) the management positions of General Manager, Assistant Manager, Marketing Director, Sales Manager, Catering Director and Controller of the Hotel (collectively "Key Persons") at the Hotel will always be staffed by individuals who are not shared with the Second Hotel, and (B) none of the Key Persons may be transferred from the Hotel to the Second Hotel without the prior written consent of Owner, not to be unreasonably withheld. If consent is withheld by Owner to such transfer in accordance with the foregoing sentence, or for the hiring of the particular Key Persons by the Second Hotel, Operator agrees that it, Regent or any Restricted Affiliate will not consent to the hiring of the particular Key Persons by the Second Hotel as an alternative to such transfer for a period of at least two years. Operator will use reasonable efforts to ensure that so long as Regent, Operator or any Restricted Affiliate of Operator is the manager of The Regent Beverly Wilshire, the Regent Beverly Wilshire will continue to be called "The Regent Beverly Wilshire." For so long as the Second Hotel is called "The Regent Beverly Wilshire," Operator agrees that the Second Hotel will not be included within the centralized reservation system managed by Operator on behalf of Operator and other hotels such as The Pierre and the Ritz Carlton in Chicago. In the event that the Second Hotel is included within the centralized reservation system managed by Operator on behalf of Operator and other hotels, Operator agrees that it will use its best efforts to instruct its employees to extend reservations with respect to the Hotel and the Second Hotel on a fair and equitable basis consistent and in compliance with its duties under the Agreement and applicable law, taking into account each Hotel's distinct facilities, rates, availability and other characteristics, together with the needs of the particular guest or guests.

(c)     Operator may submit a written proposal to Owner to permit Operator or an affiliate to own, lease, manage or operate a third hotel in the radius area. Owner agrees to review such a proposal (and if Operator desires, Owner will also discuss such a proposal with Operator). However, Owner's sole obligation under this Section 26.01(c) is to review such a proposal (and if Operator desires, to also discuss such proposal with Operator). It is hereby expressly

understood and agreed that Owner, notwithstanding anything to the contrary in the Agreement (including Section 23.01) or elsewhere, shall have the absolute and unfettered right to reject, accept, or otherwise deal in any manner whatsoever with any such proposal (including Owner requiring payments, compensation and/or other consideration or conditions in connection with any acceptance of such a proposal, whether or not Operator thinks that Owner's rejection or Owner's requirements relating to the proposal are unreasonable, arbitrary or excessive) for any reason in Owner's sole, absolute and unfettered discretion.  In no event shall Owner have any liability or obligation whatsoever in connection with its rejection, acceptance or otherwise dealing with such proposal, or otherwise in connection with this paragraph (c) (other than the obligation to simply review such a proposal (and to discuss such proposal with Operator if Operator so desires)).

(d)   Burton Way shall have the right (which right shall survive the termination of the Agreement) to seek a temporary and/or a permanent injunction or other relief as may be available at law or in equity by way of arbitration and/or in a court of competent jurisdiction to enforce the foregoing provisions of this Section 26.01, notwithstanding the arbitration provisions or the other contained in the Agreement.  Without limitation of the foregoing, Operator hereby acknowledges and agrees that in the event of a breach of the provisions of Section 26.01 by Operator pecuniary compensation would not afford adequate relief to Burton Way and/or it would cause great or irreparable injury to Burton Way and it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to Burton Way, and accordingly, notwithstanding anything to the contrary herein or elsewhere including any statutory laws, Burton Way shall be entitled to obtain temporary and final injunctive relief in order to enforce Section 26.01 in the event of such a breach or to prevent a breach.  ......

5.   **Other Management Agreement Changes**

In addition to the foregoing, the Agreement is hereby amended as follows:

(i)   ███████████████████████████████████████

(ii)   Paragraph 9.01 of the Agreement is amended by deleting the words "fifty-fifth (55th)" and replacing them with the words "seventy-fifth (75th)."  Paragraph 9.02 is deleted in its entirety and the words "including, without limitation, the covenants and undertakings set forth in paragraph 9.02" are hereby deleted from paragraph 18.05 of the Agreement (and consistent therewith, Ground Lessor shall be deemed released from any obligation with respect to said paragraph 9.02 whether in the Agreement or otherwise).

███████████████████████████████████████

(iii)

(iv)

(v)





(vi)    Except as Owner may specifically authorize by prior written consent, in Owner's sole and absolute discretion, Owner shall bear no responsibility for any expenses or charges incurred in connection the relocation of the Hotel's General Manager except as expressly provided for in Section 5.06 of the Agreement. For example, any charges for losses experienced in the sale of a home by the General Manager shall require such consent.

**6.    Major Capital Program**





7.    **Release and Estoppel as to Past Claims**

Concurrently with the execution of this Amendment, Owner and Operator will exchange release and estoppel certificates in the form of **Exhibits 7A and 7B**.  Further, notwithstanding anything to the contrary herein or elsewhere, Four Seasons acknowledges and agrees that there is not and shall not be any Incentive Fee owed or applicable for the 1998 Fiscal Year or any previous periods.

8.    **Owner's Privileges**





## 9.    Miscellaneous

It is expressly acknowledged and agreed by Burton Way and Four Seasons that this Amendment effects and evidences various settlements and compromises which the parties have made as part of their continuing ongoing relationship and in the interest of resolving various disputes and claims and clarifying various rights and remedies.  The provisions, existence or circumstances of this Amendment or any concurrent or contemporaneous transactions (including, without limitation, the consideration and/or amounts paid or related to the resolution of such matters or any particular part thereof and/or the manner in which the same are being resolved) shall not be used in any way to determine or measure the existence, extent or amount of any damages, losses or consequences which may result from the breach of any obligations in the Agreement or this Amendment which are not otherwise released by this Amendment or the documents contemplated hereby (including, without limitation, Section 26.01 of the Agreement as hereby amended).

The addresses in Article 25 of the Agreement are hereby replaced with the following:





The Exhibits to this Amendment are part of this Amendment and are hereby incorporated in this Amendment. The breach or default thereunder or under any other transactions contemplated to occur concurrently or contemporaneously herewith shall also constitute a breach or default hereof.

This Amendment and the documents contemplated by the parties to be executed contemporaneously with this Amendment constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes in all respects all prior oral or written proposals, negotiations, conversation, discussions and agreements between the parties concerning the subject matter hereof.

Without limitation of the foregoing, except as otherwise provided herein and the documents contemplated by the parties to be executed contemporaneously with this Amendment, the parties have not made and are not hereby making any acknowledgements, representations and warranties to each other at the time of (or in connection with) this Amendment. The representations and warranties in this Amendment shall survive the execution and delivery of the Amendment and of any documents delivered pursuant to its terms.

The parties agree to promptly execute and deliver all further instruments and documents, and to take such further actions, as may be necessary or desirable to effect the provisions and intentions of this Amendment including, without limitation, the prompt recording of duly executed reconveyances and UCC terminations upon closing. Further, for all U.S. federal, state and local tax reporting purposes, the parties agree that they will each report, treat and characterize transactions and the effects of this Amendment in accordance with the form, terms and characterizations of such transactions and effects as provided in this Amendment.

Each individual signing this Amendment, by affixing his/her signature hereon, does thereby personally represent and warrant (with individual personal liability for any breach of such representation and warranty) that he/she, and the party for which he/she is signing, are fully authorized and empowered to, and by his/her individual signature hereon, does hereby execute and deliver this Amendment on behalf of such party, and cause such party to be, legally bound to this Amendment.

This Amendment may be executed by fax (or otherwise) and/or in counterparts and will nonetheless be enforceable, effective and admissible.

Four Seasons Hotels Limited, an Ontario corporation

By: _____
Its: Executive Vice President

By: _____
Its: Assistant Treasurer

Burton Way Hotels, Ltd., a California limited partnership

By: _____
Robert Cohen

By: _____
Joseph Cohen

SCHEDULE 1

*the*
## Regent
# BEVERLY WILSHIRE
### A FOUR SEASONS HOTEL

Repro___ion Art
For All ___plications
This art works for
both positive and
reverse applications.

Key to Usage
1. General Large size
2. C4 Meeting Planner Kit Cover size
3. A5 Rack Brochure Cover size
4. Business Card size

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

*the*
*Regent*
BEVERLY WILSHIRE
A FOUR SEASONS HOTEL

**Reproduction Art**
**For All Applications**
This art works for
both positive and
reverse applications.

**Key to Usage**
1. General Large size
2. C4 Meeting Planner Kit Cover size
3. A5 Rack Brochure Cover size
4. Minimum size Signature (Do not reduce logo smaller than this size)
5. Business Card Signature

**Large Size Signature**

**Small Size**

**Signature**

**Business Card Size Signature**

**Minimum Size Signature**
(For all applications, other than Business Cards, where minimum size is required)

 

AKIN GUMP STRAUSS HAUER & FELD LLP
David C. Allen (SBN 190479)
dallen@akingump.com
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BURTON WAY HOTELS, LTD., a California limited partnership; BURTON WAY HOTELS, LLC, a Delaware limited liability company; and ACC COMPANY, a California general partnership.　　**PLAINTIFF(S)**　　v.　　FOUR SEASONS HOTELS LIMITED, a Ontario (Canada) corporation.　　**DEFENDANT(S)**. | **CASE NUMBER**  **CV11 0303 PSG PLAx**  **SUMMONS** |

TO:   DEFENDANT(S): Four Seasons Hotels Limited

_____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, David C. Allen _____, whose address is 2029 Century Park East, Suite 2400, Los Angeles, California 90067 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____JAN 1 1 2011_____

By: _____CHRISTOPHER POWERS_____
        Deputy Clerk

        (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Burton Way Hotels, Ltd.; Burton Way Hotels, LLC; and ACC Company | Four Seasons Hotels Limited |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Akin Gump Strauss Hauer & Feld LLP; David C. Allen, dallen@akingump.com; David W. Nelson, dnelson@akingump.com; 2029 Century Park East, Suite 2400, Los Angeles, CA 90067; ph: 310.229.1000; fax: 310.229.1001 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☑ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2. Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No        ☑ MONEY DEMANDED IN COMPLAINT: $ More than $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Breach of contract and related tort causes of action filed under diversity jurisdiction, 23 U.S.C. section 1332.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 355 Motor Vehicle Product Liability | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 444 Welfare | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☑ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | IMMIGRATION | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**CV11   0303**

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                                                     ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                                     ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                                     ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All Plaintiffs reside in Los Angeles County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Defendant resides in Canada |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All claims arose in Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): X _Ian C. Allen_   Date January 11, 2011

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Paul Abrams.

The case number on all documents filed with the Court should read as follows:

## CV11- 303 PSG (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division** | **[ ] Southern Division** | **[ ] Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY